IN RE APPEAL OF BANKERS LIFE COMPANY, Appellant, v. HARRY F. ZIRBEL et al., Appellees.

No. 47074.

(Reported in 31 N. W. 2d 368)

276

March 9, 1948.

Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, for appellant.

F. T. Van Liew and Herrick, Sloan & Langdon, all of Des Moines, for appellees.

Smith, J.—The property in question extends from Seventh to Eighth Streets in the City of Des Moines, a distance of 280.5 feet, and from High Street north approximately 234 feet including a part of the vacated portion of Pleasant Street.

The building fronts on High Street and the main part is

93 feet deep north and south and 239 feet long east and west. It has six full floors above basement and ground floor and a smaller dimension seventh floor.

An L on the north is 128 feet long east and west and 90 feet north and south. It is only the height of the second story of the main part and contains a gymnasium, locker rooms and gallery on the basement and ground floor levels and an auditorium on the first and second floor levels.

The 1941 assessment appealed from fixed the actual land value at $124,480 and building value at $2,271,240, total actual value $2,395,720. The sixty per cent taxable value was thereby established as $1,437,430. The board of review and district court confirmed the assessment as made. On this appeal no serious complaint is made of the land valuation. The controversy seems to concern only the building.

The building value of $2,271,240 was arrived at by deducting ten per cent from the appraisal of $2,523,600 made by an appraisement company which was employed to value the central business district of the city in connection with the 1941 assessment. This ten per cent deduction was not made with reference to this particular property alone but was the result of a general horizontal ten per cent cut of most of the appraisal figures set by the company throughout the city. The appraisal company's valuation of $2,523,600 on the building was arrived at by using an estimated replacement value of $2,804,000 and deducting ten per cent initial depreciation therefrom.

However, the company appraiser, after testifying clearly as above stated, added a qualifying and apparently contradictory statement:

"* * * if I had been appraising the building according to its reproductive cost—replacement cost, less depreciation, I should have had a total replacement value of approximately $3,000,000, and one per cent depreciation—therefore, a sound value of $2,970,000. As I pointed out, there are other factors that I adopted. I considered the value of the property for the purpose for which it is being utilized. I considered what it might conceivably be used for."

He said on cross-examination:

"I did not ask anybody what they thought the building might bring if placed on the open market. However, I asked myself that question, knowing that there was a possibility of appeal being taken from my valuation and I came to the conclusion that assuming a willing seller who did not have to sell, and a willing buyer who did not have to buy, that the property would bring not less than the total value that I placed on it."

The building was completed in 1940 and this first assessment of it was as of January 1, 1941. In its 1940 report to the insurance commissioner, sworn to in February 1941, plaintiff gave the book and market value of the property as of December 31, 1940, $2,857,156.75 and its cost, $3,129,610.60. This included ground and building.

A plat offered by plaintiff shows the business district west of the river as roughly seven blocks north and south by nine blocks east and west. Plaintiff's building is shown to be approximately three blocks from both the office building center and the retail center and at the north edge of the district.

Witnesses on both sides agree in praise of the building as representing the ultimate in both beauty and utility of design and construction. Plaintiff, without admitting extravagance, argues that much of the actual cost of the building, because of its location, unnecessary perfection, and monumental character, is not and cannot be reflected in its actual value for assessment purposes.

Illustrative of this point one witness for plaintiff estimated the cost of a downtown building of comparable net office area and of "typical, standard column beam construction" at somewhat less than one half the cost of plaintiff's building. This of course involved entire omission of the gymnasium and auditorium features and the use of less expensive but standard material in many parts of the structure.

Along the same line this witness estimated what would have been the cost of construction of plaintiff's building (without the auditorium wing) built in the same manner as was the United Life Building in Omaha, Nebraska. He arrived at a figure about 58.5 per cent of its cost as actually constructed.

It would be interesting to describe in detail the features which plaintiff contends added to the cost, but not to the actual and taxable value, of the building. The foregoing is sufficient however to present appellant's contention.

Eleven propositions for reversal are relied on. For our purpose they may be summarized and compressed to the following: (1) The assessment is not entitled to the benefit of the usual presumption in favor of the judgment of the assessor (2) the assessment should have been based on market value, and replacement cost, less physical depreciation, is not the measure of market value (3) allowance should have been made for "functional depreciation" on account of location and special purpose and monumental character of the building (4) valuations reported to the insurance commissioner were not conclusive (5) investment of plaintiff's funds in the building may have been a sound one for it, though not for investors generally, and therefore did not establish market value, and (6) occupancy of building by plaintiff itself instead of by tenant was not a factor affecting market value.

■ I. Plaintiff's first proposition relied on must be sustained on the authority of Iowa Building Corp. v. Zirbel, 237 Iowa 242, 21 N. W. 2d 576, which also involved a 1941 Des Moines assessment. The value here was of course fixed in the same manner as was the value involved in that case. The ten per cent over-all reduction of the appraisement presumably was an exercise of the judgment of the assessor as to the general level of values of all properties but it did not result in any *equalization* of values. The custom of accepting the judgment of a hired appraisal firm as fixing the proper relationship of values of the individual properties with each other cannot be approved for the purpose of according it the benefit of the "strong" presumption usually to be accorded the judgment of the assessor.

■ Nevertheless it is true here as it was in the Zirbel case that under the statute the burden is upon the appealing taxpayer to establish that the assessment is in fact excessive or inequitable, however it was computed. We must weigh the evidence to determine whether that burden has been sustained.

■ II. Appellant argues that where property has a market value, actual value and market value are one and the same. This does not seem to be an entirely sound proposition in view of the language of the statute:

"In arriving at said actual value the assessor shall take into consideration its productive and earning capacity, if any, past, present, and prospective, its market value, if any, and all other matters that affect the actual value of the property." Section 441.4, Iowa Code, 1946.

This language indicates that "market value, if any," is only an element to be considered in fixing "actual" value.

However, in Hawkeye Portland Cement Co. v. Board of Review, 205 Iowa 161, 166, 217 N. W. 837, 840, in speaking of this statutory language, it is said:

"It thus becomes apparent that the legislature had in mind that there might be property subject to taxation which would have no market value. Under the present statute, the assessor is to take into consideration the market value, if any, of the property. True, he is to take into consideration the productive and earning capacity, if any, past, present, and prospective; but these are all elements which go to make up market value. If the property has a market value, then, as it occurs to us, there can ordinarily be no distinction between market value and actual value."

Preceding this language the opinion points out that formerly the statute provided: "Actual value of property * * * shall mean its value in the market in the ordinary course of trade"; and that this provision had been amended to read as quoted above. The opinion later says: "Thus it is quite clear that, if property has a market value, said market value and the actual value are usually the exact equivalent of each other."

The Hawkeye Portland Cement Company case is cited and quoted in Call v. Board of Review, 227 Iowa 1116, 1121, 290 N. W. 109, 111, and Lincoln Joint Stock Land Bk. v. Board of Review, 227 Iowa 1136, 1138, 290 N. W. 94, 95.

From this language it is argued that *if* the Bankers Life Building had any "market value" such value must have been

the "actual value" and following this premise appellant proceeds to demonstrate that it *did* have market value because various witnesses testified it had. One said: "I think every property has a market value." Another said: "I regard this property as having a market value." And still another: "There is a market value for the Bankers Life Building."

These were plaintiff's witnesses. Even witnesses for defendant expressed similar opinions:

"It is my opinion that the Bankers Life Building does have marketability and market value"; "I don't think there is any question but what a buyer could be found for that building at a very substantial figure"; "I think any building has a market value"; "In my opinion market value in this case would be the same as actual value."

It is apparent the term "market value" does not mean the same thing to all men or under all circumstances or for all purposes. Names are not conclusive. Even Russia claims to be a "democracy"!

It has been many times judicially announced that market value is what a willing buyer would pay and a willing seller would accept. The definition presupposes that such a meeting of minds is possible. The witnesses who expressed the opinion that every property has market value must have assumed this possibility always exists.

But the statute says: "market value, *if any*, and all other matters that affect the actual value of the property." And even in the Hawkeye Portland Cement Company case, supra, it is cautiously concluded that "*if* property has a market value, said market value and the actual value are *usually* the exact equivalent of each other." (Italics supplied.) This is not the same as saying they are "one and the same" or that market value is the sole test.

Clearly, the "market value" mentioned in the statute and cited decisions is not of the character referred to by some of the witnesses above quoted. There is doubtless property which could not be sold by the ordinary processes of bargain and sale. Even a "willing" seller might not agree to accept the

utmost a "willing" buyer would pay, or a willing buyer might not pay the least amount a willing seller would take. On the other hand, some property is of a kind that is habitually bought and sold to such an extent that qualified witnesses can express intelligent opinions on market value, based, not entirely on conjecture, but on experience or observation of actual sales of comparable properties.

But we think this discussion more or less academic. Market value, in absence of an adjudication, is itself a mere matter of opinion. The assessor cannot *know* it any more than he can know the actual value. Both are matters of proof. Doubtless the same evidence would be material on either issue. The language of the statute must be interpreted to require the assessor to take into consideration *"evidence* of market value, if any." It is actual, not market value, that is to be ascertained. That is the object of the inquiry. Whether actual corresponds with market value is quite immaterial. It may not always do so. To first establish or assume a supposed or theoretical market value to be then "taken into consideration" in arriving at actual value cannot be intended. We think the statute in effect requires the assessor to take into consideration available *evidence* bearing on "productive and earning capacity, if any, past, present, and prospective," and on "market value, if any, and all other matters that affect the actual value of the property."

Certainly the matters that reduce market value or make it nonexistent must be considered but they do not of necessity reduce or affect actual value to the extent or in the same manner that they affect market value. Nor is the assessor required to determine market value as such.

What we have said in this division is in substantial accord with our opinion in In re Appeal of Massachusetts Mut. L. Ins. Co., 233 Iowa 916, 928, 11 N. W. 2d 17, and not out of harmony with the earlier opinions already cited.

Appellant cites various decisions from other jurisdictions. In some respects State ex rel. Northwestern Mut. L. Ins. Co. v. Weiher, 177 Wis. 445, 447, 188 N. W. 598, is most nearly in point. It involved the home office building of the relator company. The same arguments were urged in that case as are urged here on account of claimed excessive cost of construction

which did not add to market or taxable value. The Wisconsin statute however expressly provided that real property shall be assessed "at the full value which could ordinarily be obtained therefor at private sale." Section 70.32, Stat. 1921. It further expressly required the assessor to consider "disadvantage of location."

The Wisconsin court properly held the statute required assessment at market value. We do not think our statute so requires, though as we have already said, *evidence* affecting market value is to be considered in fixing actual value.

Other decisions cited are manifestly based on statutes different from our own and are not persuasive here.

██ III. Other matters argued relate to various considerations affecting value. It is urged that allowance should have been made for "functional depreciation" on account of location, special purpose character, and monumental or luxury character of the building.

Clearly these are all matters that must be considered, not merely because they affect or influence market value but because they are material in determining actual value for assessment purposes. They may not have the same effect on both in all cases.

Appellant assumes the amount of the assessment here does not take into account the element of "functional depreciation" and "economic obsolescence." A careful reading of the testimony leads us to question this broad assumption. We would instead say defendants' witnesses did not think these elements as potent in reducing actual value as appellant's witnesses assumed. Some denied the existence of any such depreciation or obsolescence.

It is all a matter of judgment and degree. The appraisal company expert boldly opined that even the market value was not affected by these considerations. Another of defendants' witnesses expressed the opinion that the actual value would be "close to" the "willing seller—willing buyer" figure. This witness said he did not believe plaintiff's building entitled to any "functional depreciation" or "economic obsolescence."

The architect who testified for defendants said: "I can see no possible reason for even suggesting any credit for func-

tional depreciation" and expressed an opinion that "the building should be given some functional *appreciation*" instead. Nevertheless the actual value established by the assessment did represent a reduction of over twenty-three per cent from the actual cost of the property as reported by plaintiff to the insurance commissioner. The actual cost could not have been materially greater or less than the reasonable replacement or reproduction cost on January 1, 1941.

We have already stated that one witness for appellant estimated what the cost of the building would have been if the auditorium—gymnasium wing had been omitted and the rest of the building constructed along standard or conventional lines, omitting many so-called "excess construction" items. His estimate claimed the cost would have been approximately half the cost of the building as actually built.

Two Des Moines real estate men, as witnesses for appellant, indirectly utilized this argument by using the capitalization of income method, adding twenty-five per cent per square foot to the highest office rental in Des Moines to cover a theoretical superiority of the Bankers Life Building on account of these "excess construction" items including auditorium and gymnasium features. By so doing they arrived at "actual" value estimates far below the figure used by the assessor.

It is manifest this line of testimony is based on a merely theoretical rental value—theoretical because the building is not rented and there is in Des Moines no comparable rented building. Comparisons are not valuable as evidence when there is nothing with which reasonably to compare.

The same difficulty precludes or makes of little value comparisons of property values for equalization purposes. Defendants contend in various ways that appellant, in its objection to the assessment and its appeal to the district court, has not raised this issue. We doubt the validity of the contention. Probably an objection that the property is assessed "for more than the value authorized by law" is broad enough to permit any showing tending to require a reduction on appeal.

But we find here no sufficient evidence to support a reduction of the assessment on the ground that it is inequitable. In

the very nature of things such evidence would be difficult to produce in the absence of comparable properties.

The problem resolves itself into an inquiry whether the additional items labeled as "excess" are of such a luxury or ornamental or monumental character and the location so disadvantageous as to require a more drastic reduction from replacement or reproduction cost than was made here. Our study of the record leads us to conclude the excessive cost of construction above so-called "standard" represented a striving for utilitarian rather than aesthetic perfection. At least it seems to be conceded that even the additional cost items due to use of the highest grade of material justify themselves to some extent in greater durability, lessened maintenance cost and utility as well as in beauty and dignity of the resulting structure.

The "luxury" features such as gymnasium, auditorium, extra elevators, pneumatic tube system, panel heating, auxiliary lighting plant and unusual capacity air-conditioning system are not to be written off in toto when determining actual value.

The question of location does not seem too important. Three blocks from the retail and office building centers is not such a distance as materially to affect actual value of a building of this kind, however much it might justify difference in land values.

IV. Appellant contends that valuations reported by it to the insurance commissioner were "not conclusive as to actual market value." We have already said the quest here is not primarily for *market* value. These reports are not conclusive as to either actual or market value but they cannot be ignored.

In the first report made after the building was completed and occupied, the book value and market value of the property were reported as $2,857,156.75, nearly twenty per cent above the actual value upon which the assessment complained of was based.

The purpose of the statute (section 508.11, Code, 1946) that requires reports from life insurance companies is undoubtedly to assist the insurance department in determining the financial condition of the company. That must contemplate some consideration of the value of its properties and whether they

are worth the value at which they are carried on the company books. The purpose of all state regulation is "to make certain that the citizen will secure the indemnity for which he contracts and that the rates and charges for insurance which may be required of him will be reasonable." 44 C. J. S., Insurance, section 60. See section 508.12, Code, 1946.

It is surely proper therefore, in arriving at the actual value of insurance property for tax assessment purposes, to know at what book and market value the company itself carries such property. While not conclusive it is important. We cannot say the very considerations influencing appellant in arriving at these reported figures should not also have an influence in determining actual value.

■ V. Many arguments are advanced by the parties. In fact the briefs of counsel for both appellant and appellees are unusually able and seemingly exhaustive of every possible angle involved. We are compelled to omit many details that might conceivably be interesting to the profession.

The case is unique in that expert witnesses on both sides so unanimously praise the outstanding character of the building. One architect (not the one who designed it) generously said he had "been impressed with the intelligent use of an opportunity that comes once in one hundred years to create as near a perfect structure in all regards as it is possible to produce." He adds:

"I think every feature in the building, with very few exceptions, contributes the full value which it cost either in permanence, in efficiency of arrangement, efficiency of operation, in economy of maintenance, and in prestige and advertising value which of course contributes to the business success of the owner."

It is difficult to determine how much depreciation, if any, should be taken from replacement or reproduction cost in a case of this kind on account of possible unnecessary elaboration in design and construction. The figures indicate a substantial reduction of almost twenty-four per cent from what plaintiff itself considered to be actual cost. We are not prepared to say the record shows this an insufficient allowance. The statutory requirement that all property shall be assessed at sixty per

cent of actual value tends to mitigate somewhat the inevitable but not always discernible injustices due to over-valuation.

As has been said in many decisions, the science of assessment for taxation is far from being an exact science. Perfection is unattainable because there is no such thing as perfection. This is merely another way of saying that valuation, for assessment purposes, is in the realm of opinion and there is no absolute standard.

The records and briefs here are•long and apparently no consideration has been left unexplored. We find no sufficient basis upon which to interfere with the decision of the trial court. It is therefore affirmed.—Affirmed.

MULRONEY, C. J., and OLIVER, BLISS, HALE, GARFIELD, MANTZ, and HAYS, JJ., concur.