O. A. CLARK et ux., appellees, v. LUCAS COUNTY BOARD OF REVIEW and members, appellants.

No. 47693.

(Reported in 44 N.W.2d 748)

82

NOVEMBER 14, 1950.

REHEARING DENIED JANUARY 12, 1951.

A. V. Hass, of Chariton, for appellants.

Hoegh & Meyer, of Chariton, for appellee.

BLISS, J.—Plaintiffs owned the Hotel Charitone building and ground in Chariton, Iowa, on January 1, 1949, as of which date the Lucas County assessor fixed the one hundred per cent, or actual, value of the building at $48,310, and of the ground at $9100, and the sixty per cent, or assessed value, of each, respectively, at $28,986 and $5460, or a total assessed value of $34,446. Plaintiffs filed a written petition to the board of review alleging that the assessment was "illegal, excessive, discriminatory, erroneous, inequitable and confiscatory", and asked that it be reduced to $22,000 "or such other amount as is not in excess of sixty per cent of the actual value of said real estate as of January 1, 1949." In the petition they alleged that the actual value of the building was $30,000 and that of the land $7000. Therein they listed certain "other like property" in Chariton and the assessment of each, among which were the Copeland store and office, the Nichols store and apartment, the Bates Hotel, the National Bank & Trust Company, the Chariton Leader Publishing Company, and the Larimer lots. The board of review having denied the petition and confirmed the assessment, plaintiffs appealed to the district court.

The 1949 assessment roll describes the Charitone Hotel property as the south half (S½) and the east fifty-two feet of the

north half (N½) of Lot 7 in Block 8 of the original town of Chariton. The business district is built largely around a public square, which faces a cardinal direction on each side. Branden Avenue extends along the north side of the square and Grand Avenue extends along the east side of the square and intersects Branden Avenue at a right angle. The hotel property is in the southwest corner of Block 8 at the northeast corner of the intersection of Branden and Grand Avenues and corners with the northeast corner of the public square. We insert here a roughly sketched plat showing the location of the hotel and some of the properties with which plaintiffs compare it.

The hotel ground is the L-shaped rectangle marked with the dotted or broken lines. Commencing at the northwest corner, the ground fronts west on Grand Avenue for 41 feet, thence extends east for a depth of 165 feet along and north of Branden Avenue, thence north along the alley 82½ feet, thence west 52 feet, thence south 41 feet, and west 113 feet to the place of beginning.

The hotel building consists of two structures. The older part, a two-story brick building, was built in 1913 for a store building on the ground floor. This building is on that part of the ground which forms the lower part or base of the L, if it were upright—it is the east 52′ x 82½′ of the hotel ground. The two-story building does not occupy all of this east portion of the ground. It has a south front 40 feet wide on Branden Avenue, and extends north along the alley for 67 feet. During all the time pertinent the ground floor has been occupied by two stores, and the second floor has been used for hotel rooms.

The hotel proper, which was built in 1923, is on that part of the ground which is 41′ x 125′ lying directly west of the two-story building on which the new building abuts. The latter building is of brick and has a full basement and four stories above, except for a width of 7½ feet along a part of the north side, which is but one story. The building fronts west on Grand Avenue, on which side there are three large plate-glass windows with the upper halves semicircular, and three or more similar windows on the south side on Branden Avenue. These windows are all on the ground floor. The entrance to the lobby, the entrance to the café, and the outside entrance to the barber shop in the basement are all on the south side of the building. One of the exhibits certified to this court is a picture of the hotel taken with the camera facing northeast, giving a full view of the west and south sides of the hotel. The photograph, which appellee said flattered the hotel a little, shows quite an imposing structure of pleasing appearance, and apparently in good condition externally.

Pursuant to an order of the State Tax Commission of Iowa directing the city of Chariton to make a revaluation and reassessment of all real and personal property within the city, it

employed for this purpose E. T. Wilkins and Associates, appraisers and consultants, of Cleveland, Ohio. These men undertook this work about August 1, 1947, and completed it, and their revaluations and reassessments were adopted as the official assessment for the year 1947, apparently as provided by what is now section 442.2 of the 1950 Code. In doing this work Mr. Wilkins and his associates prepared a durable pasteboard card designated a "Real Estate Tax List" for each piece of taxable real estate, containing the dimensions of the ground area of each, a plat of each building, showing its dimensions and specific and minute details as to every item of construction, with a report as to front-foot values, with various factors bearing on replacement cost and physical and actual values, physical and functional depreciation of the improvements, and the state of repair and physical condition of each building. These cards and a typewritten loose-leaf book of sixty-five pages containing information with respect to their theories of valuation and methods of appraisal, with cost data as to labor and material in various types of construction, were all left in the office of the county auditor for reference.

Plaintiffs introduced as exhibits the Wilkins "tax list" for the Charitone Hotel, and the "tax lists" for eight other so-called comparable properties above-noted. No one challenges the accuracy or the correctness of the data shown on these cards, excepting some items of valuation and depreciation with respect to the plaintiffs' property. Exhibit D-2, the loose-leaf book of data and information, was introduced by the defendants. Plaintiffs also introduced the 1949 assessment rolls for the plaintiffs' property, and for each of the comparable properties.

The district court in its opinion comments at some length on the evidence. It disagreed with the actual value of the land itself and the assessment thereof as returned by the assessor and confirmed by the board of review, by reducing the amount of the actual value from $9100 to $6800. It also reduced the actual value of the buildings as returned by the assessor and as confirmed by the board of review from $48,310 to $41,800.

In concluding its opinion the court stated:

"The court therefore finds as a fact that the value of the land and building as fixed by the assessor is excessive and in-

equitable and out of proportion when considered with the other real estate in Chariton used for commercial purposes."

Decree was rendered and entered in accord with the opinion, and it was adjudged and ordered that the total assessment be reduced from $34,446 to $29,160.

I. Defendants (in this court) challenge the soundness of each reduction, and charge the district court with error in each, which requires a reversal. We will discuss first the reduction of the actual value of the building. The court based the reduction upon the failure of Wilkins and the assessor and the defendants to charge a sufficiently high percentage of depreciation against the building. That was the court's only ground, although the court did mention "surplus construction" on the first floor based upon the testimony of one witness for the plaintiffs that the ceilings in the lobby and the dining room were too high. There might be a difference of opinion respecting the advantages and disadvantages of a high ceiling and the proper height of a ceiling in a hotel lobby. But the court bases the reduction to depreciation by the following statement in its opinion:

"The burden being on appellants, it must be said that the only inequality that has been shown is the failure to allow for sufficient physical depreciation which the court has done in arriving at the valuation figure [$41,800] above-stated."

The matter of depreciation depends upon many factors. Very important factors are the type of construction and the kind of building materials used. In the Wilkins black book of information and data (Exhibit D-2), he classifies building construction into grades A, B, and C. Of the "tax lists" of properties including the Charitone Hotel, put in evidence by the plaintiffs, the hotel was the only one in grade A. With the exception of the Ritz Theatre building, the plaintiffs' hotel was the only one noted by Wilkins as being in "good" condition. The other properties were rated as in "fair" condition, except the Bates Hotel, whose condition is noted as "poor." These grades in construction and ratings as to condition are in no way challenged.

Also on the Wilkins "tax list" card for the Charitone Hotel building are the following data respecting its construction:

foundation walls of brick and tile combination; exterior walls of building—the north and east walls are of common brick on tile inner wall, and the west and south walls are of face brick on tile inner walls; the roof is a flat built-up composition roof on wood joists; the basement floor is cement and the floors of the four stories of the newer building are of concrete, reinforced with steel; in the toilet and shower rooms, the barber shop in the basement, and the lobby and dining room there is tiling on the concrete floors; the walls of the toilet and shower rooms are of tile; the interior finish is of pine; the partitions are plaster or gypsum on tile; the heating is by vapor with a coal stoker; the electric wirings are in pipe conduits; plumbing—seven bathrooms with tubs, fourteen with showers, ten toilet rooms, seven water closets extra, three lavatories extra, two urinals; the building is of fireproof construction; windows have wood sashes; the frame of the building is of steel and there are steel column floor supports; there is a four floor push-button elevator; an 8' x 10' cooler; one fire escape and three ventilators.

Each building has a basement. The area of the two floors of the store building is 5360 square feet. The ground floor of the newer building contains 5124 square feet and the upper three floors contain 13,281 square feet.

The following data are taken from the Wilkins cards in evidence:

| Building | Age | Physical Deprec. | Funct'n. Deprec. | Replacement Value | Actual Value | Front-foot value of lots |
|---|---|---|---|---|---|---|
| Charitone 4 story | 1923 | 40% | 35% | $123,888 | $48,310 | $123.00 |
| Charitone 2 story | 1913 | " | " | | | 49.50 |
| Copeland Store & offices 2 story | 1880 | 50 | 15 | 12,718 | 5,405 | 156.52 |
| Nichols Store & apt's 2 story | 1880 | 55 | 10 | 11,627 | 4,709 | 151.06 |
| National Bank 3 story | 1850 | 55 | 15 | 42,978 | 16,439 | 128.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Chariton L. Pub. Co. 2 story | 1917 | 45 | 10 | 21,540 | 10,662 | 52.60 |
| Larimer Store 1 story | 1916 | 50 | | 14,078 | | { 51.50 52.50 |
| Bates Hotel | unknown | 75 | 30 | 32,687 | 6,220 | 63.70 |
| Ritz Theatre 2 story | 1927 | 35 | | 60,174 | | 113.75 |
| Eikenberry Store 2 story | 1894 | 50 | 30 | 30,135 | 10,514 | 94.64 |

All of these buildings listed below the Charitone Hotel are of brick, or brick and cement block, or brick and tile, construction. All have basements. None of these "comparable" buildings has a steel frame or steel pillars. None of them is of fireproof construction or has reinforced concrete floors except the theatre building. None of the others has any metal construction, except as fixtures, but the Copeland, Nichols, and Eikenberry store buildings, which have pressed metal ceilings on the first floor, and the Larimer store building has some metal beams. All of the buildings except the theatre have wood floors on wood joists and partitions of lath and plaster on wood studs. In none of these buildings is all of the electric wiring in pipe conduits, which Mr. Clark stated are superior insulation. In none of these buildings are the partitions of plaster on tile, as in the Charitone Hotel. Under the record in this case the Charitone Hotel building is superior in construction to any building with which plaintiffs compare it. In the construction of its exterior walls, its partitions, its wiring, its steel frame and supports, and its reinforced steel concrete and tiled floors it is far more durable and resistant to deterioration and depreciation than any of these other buildings.

Mr. Clark, Mr. Boss, of Des Moines, who operates many hotels (one in Clarinda which he leased from Mr. Clark), and one or two other hotel men, not living in Chariton, examined the hotel for the purpose of testifying for plaintiffs. Their testimony was that the useful life of a hotel building such as the Charitone

is fifty years. The court states that this evidence is uncontradicted, and from it, "it must be concluded that the building has earned practically all of its proper depreciation and should be depreciated at least 48%. * * * *The assessor testified that he did not consider the earnings of the building in his valuation and there is no showing that Wilkins did.* Allowing for 48% depreciation and 35% functional depreciation allowed by Wilkins, and taking the replacement cost figured by Wilkins, the building figures at a value of $41,800. There being no other comparable building in the city, there is nothing from which the court can determine whether such a valuation is in proper relationship with other buildings or not. *The only other building which the evidence shows produces a comparable income is the Ritz Theatre building. The evidence shows it produces more income but is silent as to how much more.*" (Italics ours.)

The statement of the court that there is no building comparable to the Charitone Hotel and that there is nothing from which it can determine whether its valuation of $41,800 is in proper relationship with other buildings or not is true and fully sustained by the record. But, having stated it, the court destroyed the basis for its statement a few lines below in its opinion, to wit: "The court therefore finds as a fact that the value of the land and building as fixed by the assessor *is excessive and inequitable and out of proportion when considered with other real estate in Chariton used for commercial purposes.*" (Italics ours.)

Before a property assessment can be changed because it is inequitable as compared to the valuations of similar and comparable properties in the same district it must first be shown that there are such similar properties. If there are none then, of course, no comparison can be made. Lincoln JSL Bk. v. Board of Review (Mitchell, J.), 227 Iowa 1136, 1140, 290 N.W. 94. In Crary v. Board of Review (Oliver, J.), 226 Iowa 1197, 1200–1202, 286 N.W. 428, we held that in considering whether an assessment was disproportionate and discriminatory, comparison with but one other property was insufficient, since "manifestly, an assessment is not discriminatory unless it stands out above the general level."

■ We are aware that it is not necessary to show both an excessive valuation and an inequitable one to entitle a complaining taxpayer to relief.

We will refer now to the two italicized parts of the quotation from the court's opinion, noted above. Each is without support in the record. The assessor testified that he took into consideration the rent and the earnings of the hotel, and there is no evidence that the income of the Ritz Theatre was greater or less than the income of the hotel. ·

■ The statements of the witnesses that the useful life of the Charitone Hotel or of hotels in general is not over fifty years are not of fact but are the conclusions or opinions of the witnesses, and whether denied or undenied a court is not required to accept them as conclusive. Such testimony must always stand the test of credibility and be weighed in the light of experience, reason, common sense, and the knowledge and interest or disinterest of the witness. The probative value of an opinion depends upon the soundness of its foundation. Just why should the foundation, walls, partitions, floors, windows, etc. of a hotel deteriorate in any different or greater degree than those of any other commercial building used by the public, such as a bank, store, office, or apartment? Why should the heating plant, plumbing, pipes, wiring, etc. in ·a hotel depreciate faster than like equipment in the aforesaid structures? The Bates Hotel has thirty-eight rooms. There is no testimony as to its age. Wilkins gave its condition as "poor" and its physical and functional depreciation as seventy-five per cent and thirty per cent, respectively. But it is still in operation. The National Bank & Trust Company building is one hundred years old. Wilkins rated its condition as "fair" and its physical depreciation at fifty-five per cent and that of the Charitone Hotel at forty per cent, but the court increased the latter percentage to "at least 48%", or within seven per cent of that of the bank building, although the hotel was built in 1923 and is in "good" condition and of better construction than the bank building. The theatre building is but four years newer than the hotel. Wilkins rated the depreciation of the hotel at forty per cent and the theatre at thirty-five per cent. The court increased the spread between them to thirteen per cent. The Copeland and Eikenberry buildings are both much

older than the hotel, yet the court has placed them all on a practical equality in physical depreciation. By increasing the physical depreciation percentage of the hotel the court has destroyed the proportional depreciation ratings of Wilkins.

There is no evidence of any consequence regarding the physical condition or state of repair of any of the properties other than the hotel except as Wilkins rated their condition as good, fair, or poor. Yates, thirty-two, a witness for plaintiffs, who had done some building, testified that the roof of the hotel was of a type that had a limited life, that there was "short life" in the window frames, that the doors and millwork are of white pine, that there were pipes needing replacing, and that the "type of building calls for modernization every 25 years." The Wilkins cards show that all of the buildings referred to in the record have composition roofs, wood window frames, and the interior woodwork, where noted, is pine just as the hotel has. There is no testimony as to the condition of the plumbing, pipes, or heating plants in any of the other buildings.

One important factor on the issue of depreciation is the repair and maintenance of the building, and the care it has received. Appellee's income tax reports for 1943 state that he spent $1191.53 for repairs on the Charitone and $125 for new equipment; in 1944, $2240.35; in 1945, $3768.88, and $147.17 for new equipment, that $1090.30 of the repair bill was for shower baths, including the installation of tile floors and tile walls; in 1946, the repairs were $4770.48, of which $948.52 was for a new sidewalk, $731 was for the roof, and there was a single item of $995.31. that the appellee did not recall for what it was spent; there was also $617.43 spent for new equipment, the nature of which is not disclosed; in 1947, $1169 was spent for repairs; in 1948, $2510.43 was spent for repairs, of which $1324.18 was paid for painting, and the balance of $1186.25 was the amount which plaintiffs contributed to a total expenditure of approximately $3600 for remodeling and rearranging the dining room and kitchen. The lessee of the hotel and the proprietress of the café each paid one third of this expense. This was done after the Wilkins appraisal and very probably contributed a substantial increase to the value of the hotel property. Most of the items of expenditure during these years do not specify the particular

repair or improvement made, but the amount and regularity of this expense is very tangible support for the Wilkins notation that the condition of the hotel was good.

It is our conclusion that the defendants are fully justified in complaining of the district court's decision increasing the depreciation on plaintiffs' building from forty per cent to forty-eight per cent, thereby reducing its actual value from $48,310 to $41,800.

II. We think there is also merit in the defendants' contention that the court erred in reducing the actual value of the hotel ground from $9100 to $6800. The plaintiffs and the court find fault with Wilkins for the manner in which he divided the ground for the purpose of determining its actual value. They also find fault with the assessor for accepting that method. Plaintiffs insist that the south half of Lot 7 and the east 52 feet of the north half of Lot 7 should have been valued separately. To have done so would have been to wholly disregard the division which the owner had already made of the ground, and the corresponding improvement he had constructed on it. The owner had thought it to his advantage to use the east 52 feet of this land for the erection of a two-story-double-front store building. He thus had the benefit of a 40-foot frontage on Branden Avenue and the advantage of access to the alley for the full length of his building. He had left for further improvement ground with a 40½-foot front and a 113-foot depth. Mr. Wilkins and the assessor rightly and properly accepted that division for the purpose of valuing the ground, and the plaintiffs have no basis for complaint because thereof.

The uniform depth of lots around the public square is 165 feet and with four lots to a quarter block the frontage of each lot would be 41¼ feet. The division has not always been accurate, and Wilkins gives the width of Lot 7 as 40½ feet, but the width of the hotel building as 41 feet. In appraising business lots Wilkins used certain standards and methods for all such property, which it would serve no purpose to describe or discuss. In this way he determined the front-foot prices of corner lots and inside lots. Lots fronting on the square were given a higher front-foot price than those which did not. And corner influence gave an increased value to corner lots.

Wilkins divided the hotel ground into two parts. One was the east part with a 52-foot frontage south on Branden Avenue and an 82½-foot depth north along the alley. He placed its front-foot price at $49.50 according to the uniform standards which he used. This gave that part an actual value of $2574. This lot was too far from the corner to have the benefit of any corner influence, but it had the benefit of alley influence throughout its depth. It was accessible from both the alley and Branden Avenue. It has a lower front-foot price than any lot of any of the comparable properties. The Chariton Leader Publishing Company lot, just across the alley east with a frontage on Branden Avenue of 82½ feet and a depth north of 165 feet, was given a front-foot price of $52.60. The south Larimer lot 42' x 113' abutting the west hotel lot on the north has a front-foot price of $52.50. The north Larimer lot 41' x 165' lying just north of the south Larimer lot has a front-foot price of $51.50. The Nichols lot 20½' x 165' fronts west on Grand Avenue on the public square. It is directly south of the hotel and 20½ feet from Branden Avenue. Its front-foot price is $151.06. The Bates Hotel lot is just across the alley west of the National Bank & Trust Company. It has a south frontage of 82½ feet on Branden Avenue and a depth north of 165 feet. Its front-foot price is $63.70. The theatre lot is an inside lot across the street south of the square. It has a frontage north on the square of 61½ feet and a depth of 165 feet south. Its front-foot price is $113.75. We have noted all of the inside lots in the comparable properties and this east part of the hotel ground has the lowest front-foot price of any of them. It follows that it logically and actually has a lower front-foot price than any corner lot of the other properties. Therefore it has not been discriminated against nor is it inequitably assessed in comparison with comparable lots. Its actual value is less than that of every other lot with the exception of the Larimer lots, and its actual value is greater than either of those simply because it has greater dimensions.

Coming to the lot on which the newer part of the hotel is built—it is a corner lot and will be compared with corner lots comparable to it. This portion of the hotel ground has a frontage of 40½ feet west on Grand Avenue and extends east along the north side of Branden Avenue for a depth of 113 feet. Its front-

foot price is $123. At this price and depth it would have an actual value of $4981.50, but it is a corner lot and corner influence adds an additional value of $1545, making its actual value $6526.50. The corner lot most comparable to it in location, shape, and size is the bank lot. It is a block directly west of the hotel, northwest from the square and at the northwest corner of the street intersection. Its frontage east is 41 feet and its depth west is 165 feet along the north side of Branden Avenue. Its front-foot price is $128 and with the corner-influence value its actual value is computed at $6777. There is some difference of opinion whether the bank corner or the hotel corner is the better business corner in Chariton. The pro and con opinion testimony is about a standoff. Wilkins makes the front-foot price of the bank lot $5 more than the front-foot price of the hotel lot, so there is no discrimination against the hotel property in that respect. Adding the actual values of both parts of the hotel ground makes its total actual value $9100. The area of the hotel ground, however, is 8866½ square feet, while the area of the bank lot is but 6765 square feet.

The Copeland lot is directly south of the hotel across Branden Avenue on the corner. It has greater front-foot value because it faces directly on the square. Its frontage west on Grand Avenue is 20½ feet. Its depth extends east on the south side of Branden Avenue for 165 feet. Its front-foot price is $156.52, the highest of any lot. Its corner-influence value is $1075, which is less than that of the bank lot or the hotel, but each has approximately twice the frontage. The actual value of the lot is $4283, but its area is 3382½ square feet, compared to 8866½ square feet in the hotel ground. We are not certain of the location of the Eikenberry lot. It has a frontage of 41 feet and a depth of 165 feet, a front-foot price of $94.64, and with its corner-influence value of $425, its actual value was placed at $4305. It has the same area as the bank lot, but apparently its location is not so favorable.

In their application to the board of review, plaintiffs placed the actual value of the hotel ground at $7000 and of the building at $30,000. The latter amount is less than half of what Mr. Clark and his brother paid for the building and ground in 1941, and less than half of what plaintiffs offered to sell the

ground, building, fixtures, and good will of the hotel for in 1946. Subtracting the value of the good will, which plaintiffs placed at $20,000, from the $37,000 valuation, which plaintiffs insisted was the proper valuation before the board, leaves the actual value of the tangible hotel property at $17,000. It appears to this court that plaintiffs before the board and the district court very substantially understated the values of their property, and that the district court erred in reducing the actual value of the lot to $6800, or $200 less than plaintiffs said it was worth. Talbott v. City of Des Moines, 218 Iowa 1397, 1404, 257 N.W. 393; Bennett v. Board of Review, 234 Iowa 800, 811, 13 N.W.2d 351; First Nat. Bk. v. City Council of Estherville, 136 Iowa 203, 112 N.W. 829.

III. As we have stated, there is no discrimination in value or assessment between the hotel property and the purported similar property. However, if the hotel property was assessed in excess of sixty per cent of its actual value it would be entitled to a reduction, notwithstanding there was no discrimination in valuation and assessment between it and other similar properties in the district. Hanson v. Local Board of Review, 232 Iowa 390, 394, 396, 4 N.W.2d 384, and cases cited; Deur v. Local Board of Review, 232 Iowa 989, 991, 7 N.W.2d 39.

IV. Appellees urge that the presumption that the assessment made by the assessor is correct has no application in this case because the assessor merely accepted the judgment as to valuations of the hired appraisers. We have so held in Iowa Bldg. Corp. v. Zirbel, 237 Iowa 242, 247, 248, 21 N.W.2d 576; In re Appeal of Bankers Life Co. v. Zirbel, 239 Iowa 275, 279, 31 N.W.2d 368. Although the evidence shows that the assessor did not follow the Wilkins valuation blindly, but made independent investigation of his own and weighed all of the various factors required by statute, section 441.4, Code of 1946 (441.13, Code of 1950) in making his valuations, we are persuaded to the conclusion that he gave much weight to the Wilkins appraisals. For that reason we have disregarded the usual presumption in favor of the assessor's valuations in passing upon this appeal.

V. Even though the complaining taxpayer be relieved from the burden of overcoming the presumption that the asses-

sor's valuation is correct, he nevertheless has the statutory burden of proof in establishing his contention that the valuation is excessive, inadequate, or inequitable. Section 441.13, Code 1950; Des Moines Bldg. Loan & Sav. Assn. v. Bomer, 240 Iowa 1192, 1198, 36 N.W.2d 366; Trustees of Estate of Flynn v. Board of Review, 226 Iowa 1353, 1357, 286 N.W. 483; In re Appeal of Massachusetts Mut. L. Ins. Co., 233 Iowa 916, 927, 11 N.W.2d 17; Sioux City Bridge Co. v. Board of Review, 192 Iowa 1224, 1225, 184 N.W. 733; Corn Belt Theatre Corp. v. Board of Review, 234 Iowa 355, 360, 361, 12 N.W.2d 820; In re Appeal of Blank, 214 Iowa 863, 865, 243 N.W. 173. As said in Iowa Bldg. Corp. v. Zirbel, supra (Smith, J.), 237 Iowa 242, 248, 21 N.W.2d 576, 579:

"We have still to consider whether under the evidence the trial court should be sustained in making the * * * reduction in the assessment made by the assessor and confirmed by appellants. The burden was on appellee to show that the valuation was 'excessive * * * or inequitable.' * * * Regardless of the manner in which the assessment was made and without according it the usual presumption of correctness, we are still unable to say it was either excessive or inequitable."

See also In re Appeal of Bankers Life Co. v. Zirbel, supra, 239 Iowa 275, 279. The burden on the complaining taxpayer is not met merely by showing a difference of opinion between his witnesses and the assessor, unless it is manifest that the assessment is grossly excessive and is a result of the exercise of the will and not of the judgment. Sioux City Bridge Co. v. Board of Review, supra, 192 Iowa 1224, 1225, 1226; In re Appeal of Dubuque-Wisconsin Bridge Co., 237 Iowa 1314, 1315, 1316, 25 N.W.2d 327; Iowa Bldg. Corp. v. Zirbel, supra, 237 Iowa 242, 244.

VI. An appeal of this kind is triable de novo in this court. In re Appeal of Dubuque-Wisconsin Bridge Co., supra, 237 Iowa 1314, 1315, and cases cited.

VII. The board of review having confirmed the assessment, the presumption is that the value so fixed by the board is correct, just, and equitable, and, until the contrary appears,

that it performed its duties as required by law. Benson v. Town of Le Claire, 185 Iowa 506, 507, 508, 170 N.W. 747; Hawkeye Portland Cement Co. v. Board of Review, 205 Iowa 161, 162, 217 N.W. 837; Board of Trustees v. County Board of Review, 215 Iowa 876, 879, 880, 244 N.W. 855.

VIII.   Code section 441.4, Code of 1946 (section 441.13, Code of 1950) requires the taxing authorities in valuing and assessing property to consider certain specified matters, "and all other matters that affect the actual value of the property." What is known and designated as "good will" is one of those "other matters." It is an intangible property right or asset, which enhances the value of tangible property to which and in which it appertains and inheres, and is an incident and part of it.

It is properly to be considered as an element of value in connection with the assessment of tangible or intangible property. Utah-Idaho Sugar Co. v. Salt Lake County, 60 Utah 491, 210 P. 106, 114, 115, 27 A. L. R. 874; People ex rel. Johnson Co. v. Roberts, 159 N. Y. 70, 53 N.E. 685, 45 L. R. A. 126.

"In the case of a good-will that is an incident of land, the increased value inheres in the property itself; and, in the case of most domestic corporations, that which the law assesses,— their stock,—if worth more than their tangible property, stands for all that the corporation represents, including good-will." Hart v. Smith, 159 Ind. 182, 191, 64 N.E. 661, 664, 58 L. R. A. 949, 95 Am. St. Rep. 280.

Good will is recognized as property. It may be sold or otherwise transferred. 38 C. J. S., Good Will, sections 2, 7; 24 Am. Jur., Good Will, sections 4, 12. In First Nat. Bk. v. City Council of Estherville, supra, 136 Iowa 203, 209, 112 N.W. 829, 832, we said: "Now, the term 'property' includes everything of value, tangible or intangible, capable of being the subject of individual right or ownership." In that opinion on page 211 the court quoted from Bank v. Dodge, 197 U. S. 70, 25 S. Ct. 384, 49 L. Ed. 669, as follows: " 'What, then, was embraced in the assessment of shares of stock at their full cash or selling or market value? It embraced, not only the book value of all the assets of the corporation, but the good will, the dividend-earning power * * *.' "

IX. As we have stated above the assessment of this property was not inequitable as compared to other properties. Nor does the evidence sustain the contention of plaintiffs that the actual and assessed valuations of the property were excessive in themselves. The estimates of values and of the earning capacity of the hotel given by the witnesses for each party, as is often the case, vary considerably. But there is other evidence on which greater reliance can be placed. In 1931, early in the business depression, Clark and his brother rented this hotel. They were experienced hotel men. Plaintiff testified that he was born in a hotel and had been in the hotel business all his life. They rented the unfurnished hotel for ten years for $750 a month. They bought the furnishings in the hotel from the sellers. They received the rentals from the two stores in the older building, and from the barber shop and café. They were less than $200 a month. Clark testified that business was not good during the term of the lease. But they were well enough satisfied with it that, after haggling some over a new lease, they bought the building and lot for $65,000. Appellee testified that he and his brother were desirous of buying and the owners were willing sellers. The business was operated at some profit and appellee testified that he was paid a salary out of the hotel in 1941, 1942, 1943. In the purchase price of $65,000, appellee testified he figured $15,000 was for good will, and $50,000 was for the building and ground. In December 1943 appellee bought his brother's half interest in the building for $27,500, figuring $55,000 for the building, lot, and good will, of which $15,000 was good will. Plaintiffs operated the hotel until July 1, 1946.

On the latter date they leased the hotel and ground to their son, Jack, for five years at a yearly rental of $650, assigned to him the subrentals, and sold him the hotel furnishings and equipment for $5000. The son was just out of the service in the Navy, the doctor had advised the father to ease up in his work, the parents wished to get the son into business, and his mother did not wish him to go back to New York as a portrait painter. Appellants contend that the transaction was not at arm's length, but was largely for the benefit of the boy.

In 1946, plaintiffs had some negotiations with Mr. Mitchell, a hotel operator of Ottumwa. Mr. Clark said he had in mind to

sell the hotel and fixtures to Mitchell for $65,000. Mitchell testified that he was willing to pay $60,000, figuring good will at $20,000. The negotiators never got together.

In computing the earning capacity of the hotel, plaintiffs argue, and appellee so testified, that his services were reasonably worth $300 a month as manager of the Charitone, and Mrs. Clark's services as its housekeeper were of the same value. There are some flaws in this contention. It has no application after July 1, 1946, since the elder Clarks had nothing to do with the operation of the hotel. From 1922 until they sold it in 1947 plaintiffs also operated the Clark Hotel in Albia, having sixty rooms. The Charitone has seventy-two rooms and two three-room apartments. They were operating the Ballingall Hotel as lessees at the time of the trial and had been so engaged for several years. That hotel contained one hundred nineteen rooms, and the monthly gross receipts were approximately $100,000. During much of the time pertinent, plaintiffs were operating three hotels. It is hardly probable that either of them was a full-time manager, or housekeeper, of the Charitone Hotel. It is not clear from the record where they lived during the time relevant to this case, but it was probably at Ottumwa. Clark testified he was living at Ottumwa at the time of the trial. They apparently lived there from 1943 on, for Clark testified: "From 1943 to 1946 when I sold to Jack, I managed the hotel [Charitone], living here about half of the time. I came from Ottumwa on Monday, Wednesday and Friday, a distance of 50 miles." In Clark's 1943 income tax work sheet for the Charitone Hotel we note that $500 was paid to himself as compensation, which sum is included in hotel expenses for that year. And in the expenses for Hotel Clark in 1943 his compensation was $1000. In the 1944 income report for Hotel Clark under the heading "O.A.C. Sal." are the figures showing $500 paid, and "$100.00 due O.A.C. on salary." There appears to be no charge for anything paid Clark in the 1944 Charitone report nor in the 1944 Ballingall Hotel report. There is no expense for salary to either Mr. or Mrs. Clark in the 1945 Charitone income tax report, but in the Hotel Clark report for that year the salary of each of them is given as $500. We do not find any Ballingall report for that year.

From July 1, 1946, plaintiffs' income from the hotel was the annual rental of $7800. The lessee agreed to maintain insurance policies and indemnity contracts, and to keep in repair the interior of the hotel, except that plaintiffs were to replace the heating plant if it became necessary. For the first six months of 1946, just preceding the lease to the son, the gross receipts of the hotel were $18,489.47, or an increase of thirty-three per cent over the same period of 1945. In 1945, the gross receipts were $30,484.86, and the total expenses were $21,015.76, including taxes, $1090 for putting tile floors and walls in the bathroom, and $1200 for remodeling the kitchen and dining room. This left a profit of $9469.10, without depreciation. Mr. Clark confirmed these figures by his testimony.

Without further discussion of the receipts and expenses of other years we find that there was a fair and adequate annual return on the investment at a valuation in excess of actual value of the property as confirmed by the defendants. That valuation was $57,410. Plaintiffs offered the building, land, and fixtures to Mitchell in 1946 for $65,000. If Mr. Clark meant by the word "fixtures" the furnishings of the hotel, he sold those to his son July 1, 1946 for $5000, and retained the building and lot which he felt was worth $60,000. The evidence is that in the years following, labor and material costs and property values, generally, have progressively increased. No one challenged the reproduction cost which Wilkins placed at $123,888.

It is our conclusion that plaintiffs failed to sustain the burden which the statute and our decisions placed upon them.

The decree is reversed and remanded to the district court for entry of decree in conformity herewith.—Reversed and remanded.

GARFIELD, C.J., and OLIVER, MULRONEY, MANTZ, HAYS, and SMITH, JJ., concur.

WENNERSTRUM, J., takes no part.

HALE, J., not sitting.