HERBERT S. DANIELS, appellee and cross-appellant, v. BOARD OF REVIEW OF MONONA COUNTY et al., appellants and cross-appellees (and nine other cases).

No. 47979.

(Reported in 52 N.W.2d 1)

March 4, 1952.

John D. Beardsley and Robert M. Underhill, both of Onawa, for appellants and cross-appellees.

Prichard & Prichard, of Onawa, for Herbert S. Daniels, L. E. Ewing and Grace T. Ewing, A. R. Roe and C. L. Roe, George E. Stanislav and Agnes Stanislav, L. C. Stokely, Sr., and Ola Stokely, McKenney, Seabury Farms, a corporation, Geo. E. Olson, E. Grace Prichard, E. M. Prichard, L. A. Prichard, Charlotte B. Prichard and Geo. W. Prichard, and Glenn L. Cavanaugh and Mary Evalyn Cavanaugh, appellees and cross-appellants.

Mulroney, J.—Ten appeals from the 1949 tax assessments in Monona County resulted in the County Board of Review confirming the assessments of the assessor in each case. The taxpayers appealed to the district court and the ten separate appeals were consolidated for trial. The district court reduced the assessments in nine cases and the Board of Review appeals in those cases; the taxpayers in those cases cross-appeal asserting some legal defenses but in the main claiming the reductions were insufficient. In the remaining case the appeal is by the taxpayer.

The record shows that in the year 1948 the board of supervisors hired an appraisal firm, Wilkins & Associates, to make an appraisal of the property in the county. The appraisers used a

card system and after the appraisers entered their data and one-hundred per cent appraisal on the card they gave it to the assessor. The assessor took sixty per cent of the appraisal as it appeared on the cards in making up the assessment. The assessor worked along with Wilkins & Associates in starting off the appraisement in Monona County. He discussed with them the manner and method of making the appraisals. He looked over buildings and farms with them and observed the methods they were using in making their valuations, and talked with them at various times and discussed the valuations they were making on buildings and farms at the time they were making them.

The appraisal firm did not complete its work until the month of July 1949. The County Board of Review met for the purpose of considering objections after the assessor completed the assessments in August, and the board completed its work on September 2, 1949.

I. The taxpayers contend the assessments were void because: (1) the assessor did not personally fix the values to any of the properties (2) the assessor failed to affix his oath to the assessment rolls, and (3) the assessments were not completed until midsummer of 1949 and the Board of Review continued in session beyond June 1.

The trial court rightly held against the taxpayers on these contentions. Chapter 240, section 20, Acts of the Fifty-second General Assembly, specifically authorizes the county board of supervisors "to employ appraisers or other technical or expert help to assist in the valuation of property." The record shows the assessor accepted the appraisal firm's valuation in the cases here involved. Acceptance of the appraiser's valuation by the assessor would not mean the assessor violated section 441.10, Code, 1950, providing he must "personally affix values to all property assessed by him." The requirement that the assessor affix his oath to the assessment roll is directory only where the assessment is appealed to the Board of Review. First National Bank v. City of Council Bluffs, 182 Iowa 107, 161 N.W. 706. The delay in the assessment past May 1 and in the work of the Board of Review past June 1 was because the appraisal firm did not complete the appraisals on time. The statutes fixing the dates on

which the assessor and board shall complete their work (sections 441.24 and 442.1, Code, 1950) are directory. The delay was not such as to invalidate the assessments.

II. The taxpayers argue there is no presumption in favor of the assessment because the assessor merely accepted the valuations fixed by a professional appraiser, citing such cases as Iowa Building Corp. v. Zirbel, 237 Iowa 242, 21 N.W.2d 576; In re Appeal of Bankers Life Co. v. Zirbel, 239 Iowa 275, 31 N.W.2d 368; Clark v. Lucas County Board of Review, 242 Iowa 80, 44 N.W.2d 748, and Haubrich v. Johnson, 242 Iowa 1236, 50 N.W.2d 19.

Section 441.13, Code, 1950, specifically provides that "the burden of proof shall be upon any complainant attacking such valuation [of the assessor] as excessive, inadequate, or inequitable." In all of the cases cited above, where the assessors merely accepted the professional appraisers' valuations, we held the appealing taxpayers had the statutory burden of proof to establish their contentions that the valuations were excessive or inequitable. There is but little difference in saying the assessment is presumptively correct and saying the taxpayer, has the burden of proving it is not. This is especially true because in the cited cases we have adhered to the rule that the appealing taxpayer's burden is to establish that the assessment as made by the assessor and confirmed by the board was so wholly out of line as to give rise to an inference that the assessing officers did not properly discharge their duties. Clark v. Lucas County Board of Review, 242 Iowa 80, 44 N.W.2d 748. Any possible procedural advantage which the taxpayers here might gain by reason of the fact the assessor accepted the professional appraiser's valuations vanishes entirely when the assessments were all confirmed by the Board of Review. The record here shows the board did not *merely* accept the professional appraiser's valuation. The chairman and two other members of the board testified they checked each protest; that they had personal knowledge of the property or if they did not they made a personal examination of the property; they compared the protested assessments with the surrounding farm land and they all testified the assessments were equitable and not in excess of actual value.

The taxpayers make some point of the fact that their attorney was not accorded a full hearing before all of the members of the board on each protest. The record shows the board had about 30,000 separate assessments before it. Evidently there were many appeals to the board. Plaintiffs' counsel filed, in all, eighty-nine written appeals. In order to complete its work individual members would hear an objecting taxpayer or his attorney. But the members testified all objections were considered by all members of the board. The procedure before the Board of Review is quite informal. As we said in Ferguson & Son v. Board of Review of Town of Rolfe, 119 Iowa 338, 340, 93 N.W. 352, "the statute [section 442.6, Code, 1950] does not require that the board of review shall proceed as a court * * *." The complaint can be oral or written. Section 442.5, Code, 1950; Haubrich v. Johnson, supra.

The confirmation of the assessments by the Board of Review, under the record here presented, means the assessments did arrive in the district court with a presumption of correctness. In the recent case of Clark v. Lucas County Board of Review, 242 Iowa 80, 97, 44 N.W.2d 748, 758, where the valuation was also made by Wilkins & Associates, we held: "The board of review having confirmed the assessment, the presumption is that the value so fixed by the board is correct, just, and equitable, and, until the contrary appears, that it performed its duties as required by law." (Citing cases.)

III. As a basis for what we will presently discuss we quote a portion of the statement of facts in the taxpayers' brief: "The record shows that the eastern part of Monona County is hill land while the western part is flat bottom land. The eastern portion of this bottom land is quite low, subject to overflow and floods, and is bisected by many drainage ditches and the Little Sioux River. Most of the farm lands involved in these appeals are located in this low area, although two of the appeals involve sand bar, or 'accretion' land, lying along the Missouri River, which is the western boundary of the county. The balance of the bottom land, being roughly the western one sixth of the land in the county, is free from floods and overflows, has no ditches, and has an excellent soil. The court found that a portion of this

better land, constituting at least five per cent of the land in the county, was admittedly assessed at too low a figure. The top assessment placed against the best land in the county was $90 per acre, while most of the land involved in these appeals was assessed at $60, $70, $80, or $90 an acre. The record shows the actual value of the lands involved in the appeals was only one third to one half of the actual value of the top five per cent."

The trial court correctly stated the issues in each appeal were whether the assessments were based on a valuation above actual value or inequitable in comparison with like properties. Before taking up the individual cases we can dispose of some general questions that are common to all. The taxpayers' claim for reduction, especially as to inequality, was based on a theory which was challenged by the board in the trial court and is challenged here. All of their evidence was pointed to establish that the bottom land, or ninety-five per cent farm land area, where their land was located was assessed at a higher proportion of its value than the bench land, or five per cent farm land area, which in most instances was several miles away. The taxpayers sought to establish this by the testimony of three witnesses who are called "general" witnesses, who testified in all but two of the cases. These witnesses were Mr. Hugh G. Gray, a former county auditor and a former appraiser for the Federal Land Bank of Omaha, Mr. W. J. Benson, a real estate man in Onawa and an appraiser for the State Inheritance Tax Commission, and Mr. J. A. Johnson who was once an appraiser for a life insurance company and at the time of trial secretary for another insurance association in Monona County. These three men visited all of the properties here involved and prepared themselves to testify in this case by also visiting four unimproved forty-acre tracts of land in what is called the bench or Whiting area. This is the top five per cent land in the county. These four forty-acre tracts are called the Pullen, Evans, Brunker, and Naden lands. Mr. Gray figured the value of the four forty-acre tracts at $150 an acre. Mr. Benson valued the Pullen land at $200 an acre or better, the Evans land at $225 an acre, and the Brunker and Naden land at $150 to $175 an acre. Mr. Johnson valued the

Pullen and Evans land at $200 an acre, the Brunker farm at $175 to $200 an acre and the Naden land at $175 an acre.

The general witnesses testified these four forty-acre tracts were similar to all of the farm land in the five per cent area. These tracts were assessed on the basis of about $90 an acre actual value. There is much in the record to establish that the land in the five per cent area was assessed too low in comparison to its actual value. At least one of the board members recognized this and wished the assessment on such land had been raised when they had met as a board. The trial court also recognized this but of course could not give the appealing taxpayers any relief by raising the top land. The board could have raised the assessments in the top area, but it is not clear this was called to the board's attention by these appealing taxpayers. The form they used in their written appeals, wherein they asserted their assessment was not equitable, asked for "the legal description and assessment of representative number of comparable properties * * * not less than five." The taxpayers merely wrote in the blank spaces "See generally other assessments in the county." The taxpayers in their brief say the board "arbitrarily" refused to raise the assessment on this top five per cent land. The record does not establish this.

Perhaps the assessment of the top land in the county could have been raised after the board's adjournment—and for that matter raised now—by appropriate action of the State Tax Commission under the broad supervisory powers set forth in section 421.17, Code, 1950. We merely mention this because of the general nature of the taxpayers' protest as to the farm land assessments. Their real complaint is that the top five per cent farm land is assessed too low. If it is, the best remedy would be one that would raise those assessments—rather than one that would reduce the assessments for a few protesting taxpayers in the remaining ninety-five per cent farm land area.

The taxpayers admit their land is not similar to the top five per cent land, but they argue they and all of the other owners of similar bottom land were entitled to reductions "upon a comparative basis with this five per cent land." They go on to say that all of the owners of bottom land (95%) had an equal right

to appeal and ask: "Are the plaintiffs in this action to be penalized because of the failure of the other owners to insist upon equal treatment?" The taxpayers' entire theory, at least on the claim for inequality of assessment is thus summed up in their brief: "As this type of land [top 5%] was valued by the assessors and Board of Review at from one third to one half of its actual value, the appellees feel that they are entitled to have their land valued for tax purposes on the same basis."

It is clear that the taxpayers' case for reduction proceeds upon the theory that inequity or inequality of assessment results when a few landowners, owning land several miles away, of a different and much better character are assessed too low. This is not the law. A taxpayer does not make out a case for reduction of assessment as inequitable until he shows assessments of similar property in the same district or immediate area were assessed lower than his. It is not enough for the complainant to show *some* other realty in the county was assessed lower in relation to its value as compared to the value of complainant's property. We held in Clark v. Lucas County Board of Review, supra, at page 90:

"Before a property assessment can be changed because it is inequitable as compared to the valuations of similar and comparable properties in the same district it must first be shown that there are such similar properties. If there are none then, of course, no comparison can be made. Lincoln J. S. L. Bk. v. Board of Review (Mitchell, J.), 227 Iowa 1136, 1140, 290 N.W. 94. In Crary v. Board of Review (Oliver, J.), 226 Iowa 1197, 1200–1202, 286 N.W. 428, we held that in considering whether an assessment was disproportionate and discriminatory, comparison with but one other property was insufficient, since 'manifestly, an assessment is not discriminatory unless it stands out above the general level.'"

We do not mean to hold that inequality of assessment must be established by evidence of assessment of exactly similar property. But there must be some substantial similarity before a basis for comparison is presented. Here we need go no further than the taxpayers' statements on this appeal to show no such sub-

stantial similarity is presented. They admit the comparison here is between bottom farm land that is wet, subject to overflow, and heavy, comprising ninety-five per cent of the farm land in the county and high land, with the finest soil and without drainage problems, comprising five per cent of the farm land in the county.

Three board members testified in support of the assessments. Mr. Boe, a real-estate broker testified the board "considered each individual objection." He stated he was personally acquainted with the farms involved in these appeals. He testified specifically with respect to the Daniels farm saying that his decision that the assessment was equitable was based on various considerations among which were "the values of surrounding and like land." He said the board went through the same procedure as to all of the other appeals.

Board member Whiting is a farmer and former real-estate broker. He said the board had personal knowledge of most of the farms here involved and they went out and looked at those they did not know about. He said: "We tried to arrive at a value on those properties and whether they were assessed at more than what we thought the valuation was and took into comparison lands around them, whether they were equitable with the lands around them and whether they were equitable in general with those lands surrounding them." He further testified:

"I consider the valuations that were made on those properties embraced in these appeals were in line with the properties surrounding them for an area of several miles.

"We did not specifically try to compare a property located ten or fifteen miles away. We did try to put the whole county in balance. I consider the valuations of the properties involved in these appeals to be equitable with properties of the same character and kind, location, productivity, within a radius of several miles around those properties."

Mr. Andrew J. Johnson, a farmer and chairman of the board, testified generally that all of the objections were considered by the board and he agreed with the testimony of Mr. Boe and Mr. Whiting as to the valuations.

IV.   The general witnesses also testified in support of the taxpayers' claims for reduction on the ground their assessments were on valuations in excess of actual values. But again much of their testimony is of little or no value because they used their comparative theory—bottom land as to bench land—when testifying as to actual value of the taxpayers' land. On this phase of all the cases, except appeal No. 10, we can eliminate the testimony of Mr. Gray entirely. He flatly stated: "The valuation that I have placed on the various properties in appeal was based as being in ratio to the land I consider to be 100% land represented by the four examples * * *."

The same is true with respect to the testimony of general witness Johnson. He said: "I placed my valuations on the lands as compared with valuations on other lands by starting with the lands along the pavement here [top 5% land]. The prices that I have placed are somewhat of comparative prices." At another place he stated his figures were based on a loan value and the market value would be "40 to 50 per cent higher." In the taxpayers' brief they explain "that the valuations placed by these three [general] witnesses upon the various tracts of land involved in these appeals are not the 100% valuations at which the land should be assessed, unless the valuations placed upon the bench land are raised, up to $150 to $225 an acre, rather than the $90 an acre at which it is now valued."

It is not quite so clear in this record that the valuation testimony of Mr. Benson was based on the comparative theory but the taxpayers say it was and we would be entitled to accept their explanation—which, in our opinion, would render it valueless as tending to establish the taxpayers' farm lands were assessed on a valuation in excess of actual value. But in any event the testimony of all three is of slight value. The testimony of Johnson and Benson consists of an exhibit listing each parcel of land that is here involved with the value by Benson and the value by J. A. Johnson (identical in each case) after each listing. Mr. Benson testified the market values on many of the properties would be higher than as shown in the tabulation, and, when asked to explain this, he said: "I never figured that the taxable value should be as high as the market value."

A taxpayer having the burden to establish that his property was assessed on a valuation in excess of actual value must present evidence of the actual value of the tract involved on January 1 of the assessment year. The court, charged with the duty of deciding whether the assessor and board assessed the tracts on valuations exceeding actual value, could receive little or no aid from the testimony of these general witnesses. On this issue the court is not interested in a witness's idea as to the actual value of a tract as compared to some other tract on which the witness has fixed some artificial value, nor is the court interested in a witness's idea of the loan value or taxable value as distinguished from market value. The board members all testified the assessments were based on actual valuations.

█ V. Some of these appeals involve the assessment of farm buildings where the claim is that they were assessed on a valuation in excess of actual value. Some general observations can be made with regard to the testimony of the board on this issue to avoid repeating it in each case. The trial court found that "unquestionably, preceding assessments of buildings in the county, both urban and rural had been done haphazardly and radical adjustments were warranted." He further found that "The added values placed on buildings in the 1949 assessment seem to have been on a rather uniform basis." The record shows the appraisers first gathered material costs, construction costs and all other costs going into the construction of a building and then set up basic square-foot schedules with replacement costs as the basis. These schedules were applied to rural property with lesser construction costs due to recognition that the average farm building is built with considerable assistance from the owner or tenant. In determining the replacement costs the appraisers used 1943 as the basis because it was felt that a more realistic value would be produced. All of the farm buildings were inspected and measured and physical and functional depreciation estimated by more than one person in order to arrive at the actual value. It fairly appears from the record that the system employed for building appraisals upon which the building assessments were based was about as scientific an approach to the difficult problem of building appraisals as it is possible to obtain.

·When applied uniformly, and the record shows it was so applied, it would secure equality in the distribution of taxes. Of course it leaves estimation of physical and functional depreciation for the opinion of the appraisers and assessors. But at least it reduces the field for variance. to depreciation and to this extent it is an improvement over appraisals made up wholly of the opinion of the appraiser.

The taxpayers' main reliance here is on the testimony of the general witnesses. They merely gave their opinion of the value of the buildings in round numbers after inspecting and stepping them off. What we said in the last above division with respect to their testimony as to value is applicable here. That is especially true with respect to the tabulated values placed on the buildings by Benson and J. A. Johnson, which according to their oral testimony would not be their opinion of actual value for assessment purposes.

It must have been perfectly apparent to the taxpayers that the valuations were arrived at by the application of some system. The odd amounts would indicate this and the appraisal cards, which were available to the taxpayers and have been certified here, contain measurements and much other data, including age and condition of the building, depreciation figures and replacement values. Mr. Herrington testified that a bound copy of their schedule of building costs used in making the appraisals was filed in the assessor's office. Obviously, if this system were applied uniformly in the appraisals of the farm buildings and a taxpayer did not question the data on the appraisal card, equality of appraisal would result even though a taxpayer might feel his appraisal was too high. With knowledge of the system employed the complaining taxpayers should have opposed the testimony of the appraisement with some testimony showing the data on the card was incorrect—that the replacement figures were wrong or depreciation per cent erroneous. The trial court found that the employment of the system and formula in making the appraisal raised valuations on farm buildings "by the startling figure of 335 per cent over the preceding year." In such a situation it would not be at all difficult to obtain much opinion testimony merely stating a farm building was assessed too high. But

the trial court also found the system was applied uniformly so "the end result, being the amount of tax moneys raised, will not change the taxes nearly so much as the figures above given on first impression might indicate." Evidence that an appraisal was *too high under the uniform system employed* would be needed before the presumption of correctness would be overcome. Equality is the theme of taxation. Raising building values by 335 per cent no doubt left many taxpayers with a feeling that the buildings were assessed too high but they were not harmed by the raise so long as the values of all buildings were raised equally. They would be harmed if the court reduced some assessments on the complaint they were "too high" supported by nothing more than opinions to that effect.

VI. At this point we are able to make some general conclusions in answer to the general questions we have discussed. Inequality of assessment is not established by showing top land assessed at a less proportion of its actual value than a taxpayer's bottom land. We are of the opinion that such evidence does not present a proper basis for reduction for inequality of the farm land assessments here involved.

The value testimony of the general witnesses as to the farm lands is of little or no assistance to the taxpayers on the issue of whether their property was assessed on a valuation exceeding actual value. This is so because it fairly appears it is comparative value testimony rather than actual value testimony.

The opinion testimony of farm building values, that does not challenge the data on the appraisal cards or question the depreciation estimates, would be insufficient to overcome the presumption of correctness of the assessments. Since it is abundantly clear the building appraisal system was applied uniformly, assessments made thereunder should not be reduced except upon evidence that questions the application of the system to taxpayers' property.

These conclusions permit a general finding against the taxpayers on their cross-appeals on the ground the reductions were insufficient, and against the taxpayer who received no reduction. We will go through the cases on appellants' appeal, but in general our holding is that in the cases where reductions

of assessments were allowed by the trial court on the basis of inequality of assessment or assessment on a valuation in excess of actual value the decrees of the trial court are reversed, otherwise they are affirmed, and costs will be taxed to property owners.

█ VII. A final word should be said as to the taxpayers' burden in these cases. On the claim of assessment in excess of actual valuation something more than a difference of opinion must be shown. Justice Bliss in the recent case of Clark v. Lucas County Board of Review, supra, at page 97 of 242 Iowa, had this to say of the taxpayer's burden on appeal from an assessment:

"The burden on the complaining taxpayer is not met merely by showing a difference of opinion between his witnesses and the assessor, unless it is manifest that the assessment is grossly excessive and is a result of the exercise of the will and not of the judgment. Sioux City Bridge Co. v. Board of Review, supra, · 192 Iowa 1224, 1225, 1226 [184 N.W. 733]; In re Appeal of Dubuque-Wisconsin Bridge Co., 237 Iowa 1314, 1315, 1316, 25 N.W.2d 327; Iowa Bldg. Corp. v. Zirbel, supra, 237 Iowa 242, 244 [21 N.W.2d 576]."

On the claim of inequality of assessment the taxpayer's burden is not met by testimony that his property is assessed at a higher proportion to its actual value than *some* other property. The claim of inequality requires proof of assessments of similar property. And again this testimony must rise higher than a mere difference of opinion between the witnesses as to values. In short it must be such as to show the assessor and board did not do their duty. Judge Powers summed it all up in Butler v. City of Des Moines, 219 Iowa 956, at page 961, 258 N.W. 755, at page 758, as follows:

█ "The problem of determining relative values in a situation of this kind is one of the most difficult with which the courts have to contend. There is no such thing as absolute equality in the assessment of property for taxing purposes. What might seem to one qualified person to be the proper difference in valuation between two pieces of property might to another person,

equally qualified, seem to be inequitable and unjust. It is the judgment of the assessor which the statute requires in making these assessments. So long as his action is not arbitrary or capricious or so wholly out of line with the actual values as to give rise to the inference that for some reason he has not properly discharged his duty, the assessments made by him and confirmed by the local board of review should not be disturbed by the court."

## Appeal Case No. 1

### HERBERT S. DANIELS Case

The Herbert S. Daniels farm consists of 264 acres. The assessment is based on an actual valuation of $90 an acre for 261 acres and $10 an acre for 3 acres of wasteland. The court reduced the figure from $90 to $70.

As to the claim of inequality the taxpayer relied entirely upon the testimony of the general witnesses who compared the assessment of this bottom land with the sample assessments of the good land in the Whiting area or top five per cent. Mr. Johnston, the tenant, said: "Some of this farm is about like that of the neighbors' land around there * * * one end of it has got some good land on it; and some of it I would not pay the taxes on for it personally. This is about the way the farm lands generally run through the valley there by the Sioux River." But there is nothing in the record as to the assessments on the neighbors' lands. The taxpayer's burden to establish inequality was not discharged by the testimony of the general witnesses to the effect that his property is assessed at a higher proportion of its value than that of five per cent of the farm land lying in a higher area several miles away.

The same can be said with respect to the claim that the farm land was assessed on a valuation in excess of actual value. Mr. Johnston, the tenant, and Mr. Daniels, the owner, testified generally in reference to the character of the farm land and the crop records and receipts and disbursements for past years. They reviewed the flood and drainage conditions but neither of them

placed a valuation on the farm. The general witnesses gave their value testimony, but it is subject to the infirmities which we have mentioned.

It is our conclusion the taxpayer failed to sustain his burden of establishing the assessment was unequal or excessive and the cause is Reversed for decree confirming the assessment of the assessor and Board of Review.

### Appeal Case No. 2

### L. E. EWING and GRACE EWING v. BOARD

Here the trial court reduced the assessment (meaning actual value) on three buildings on the Ewing farm in Kennebec Township as follows: shop building assessed for $420 reduced to $200; granary assessed for $2098 reduced to $600; dwelling assessed for $2052 reduced to $1300. Mr. Gray valued the shop building at $50, the granary at $400 and the dwelling house at $1500. Mr. Benson and Mr. J. A. Johnson valued the shop building at $150, the granary at $50 and the dwelling at $1500. Mr. Ewing valued the shop at $200, the granary at $500 and the dwelling at $1200. This evidence shows a rather wide variance in the opinions of value among the taxpayer's own witnesses. The shop building which he thought was worth $200 was only worth a fourth of that sum in the opinion of his witness Gray and $50 less than that sum in the opinion of his other two witnesses. The granary which Mr. Ewing thought worth $500 was only worth a tenth of that sum in the opinion of Johnson and Benson and $100 less than that sum in the opinion of Gray. The testimony of all of these witnesses is that they did not apply any particular system in arriving at their valuations. They merely looked over the buildings, stepped them off as to size and put down their opinion of value. Mr. Ewing said he did not consider reconstruction costs. He said he did consider in fixing his values that he got no returns from the house because he "considered that to be for the tenant's benefit." He had 4000 bushels of corn in the granary on which he was drawing ten cents a bushel storage.

Mr. Herrington of the appraisal firm testified for the board explaining the method by which the appraisal figures were

reached. He considered them correct except for what he termed an oversight as to the appraisal on the granary. This building was originally an old elevator, and Mr. Herrington said they overlooked allowing any functional depreciation; that a "functional depreciation of 45% should have been allowed", reducing the valuation from $2098 to $1153. The three members of the board said they considered the objections as to the assessments here involved and they considered them correct.

We are of the opinion that the taxpayer failed to sustain his burden of establishing the building assessments were made on a valuation in excess of actual value; that the assessments of the assessor and Board of Review should be confirmed except as to the granary. The cause is Reversed for decree confirming the assessment of the assessor and Board of Review except as to the granary, and as to this assessment the trial court's decree reducing the valuation for assessment purposes to $1153 is Affirmed.

## Appeal Case No. 3

### A. R. Roe and C. L. Roe v. Board

The assessments involved are farm buildings valued for assessment purposes and reduced by the trial court as follows: Dwelling house No. 1 valued at $4640 reduced to $3500; barn valued at $752 reduced to $400; dairy barn valued at $2142 reduced to $1350; dwelling house No. 2 valued at $1622 reduced to $1200.

Mr. Hoffman, the farm manager of this farm, testified to considerably lower valuations as to all of the above buildings. He valued the dwelling house No. 1 at $1500, the barn at $100 and the second dwelling house at $800. He stated he did not try to figure replacement costs on any of the buildings. Even though the testimony of the general witnesses be considered as reflecting something less than their opinion of the actual value of the buildings, it is interesting to note the wide variance between their testimony and that of Mr. Hoffman. The dwelling house No. 1 which Mr. Hoffman thought worth $1500 was worth $2000 in the opinion of Gray and $2500 in the opinion of Johnson and Benson. The barn which Mr. Hoffman thought worth $100 was

worth $400 in the opinion of all of the general witnesses. The dairy barn with milk house attached which Mr. Hoffman thought worth $800 was worth $1800 in the opinion of the general witnesses.

Witnesses for the board justified the valuations of the assessor and board. Mr. Hoffman said his valuations did not "consider any replacement value because nobody would be wild enough to replace those buildings at their present size."

We are of the opinion that the taxpayers failed to sustain their burden of proof that the property was assessed on a valuation in excess of actual value. The case is Reversed for decree confirming the assessment of the assessor and Board of Review.

## Appeal Case No. 4

### George E. Stanislav and Agnes Stanislav v. Board

The record shows a mistake was made in valuing a dwelling house on this farm. It appeared a new house was built on the farm after January 1, 1949, and the old house moved off. Evidently the appraisal was made of both houses, the old house being valued at $1255, and the new house, built after January 1, at $7360. It was stipulated by the parties that the assessment on the new house for 1949 could be eliminated, but the old house would be assessed for that year but not thereafter. There is some confusion too in the trial court's decree as to this assessment. In the decree it is stated: "The court fixes the 60 per cent valuation of the old dwelling at $900." This would be raising the assessment on the old dwelling for it would be placing an actual value on it of $1500 while the assessor and board valued it at $1255. The parties speculate on whether the trial court meant to reduce the actual value to $900. It is not shown whether the parties called this obvious mistake to the court's attention to give him a chance to correct it. However, we feel it is immaterial for we are of the opinion the taxpayer failed to sustain his burden, and the assessment on the old dwelling and all of the other buildings as fixed by the assessor and the Board of Review should be confirmed.

The trial court reduced the assessments on another Stanislav farm as follows: Dwelling house valued at $1116 reduced to $900;

barn valued at $1104 reduced to $700; granary valued at $316 reduced to $200; granary lean-to valued at $57 reduced to $30; hog shed valued at $172 reduced to $100. The only evidence in this case was the testimony of the general witnesses. They fixed the value of the old house on the first farm mentioned at $500 and as to the second farm they fixed the value of the house at $800, the barn at $600, the granary at $200, the granary lean-to at $20 to $30, and the hog shed at $100.

As previously pointed out, the opinion of the general witnesses as to value is something less than actual value for taxation purposes and was based on the inspection and measurement basis. We are of the opinion the case should be Reversed for decree confirming the assessment of the assessor and the Board of Review as to all of the buildings, including the old house, with, however, the assessment for the new house, valued on the card (Exhibit 62) at $7360, eliminated.

## Appeal Case No. 5

### L. C. STOKELY, Sr. and OLA STOKELY v. BOARD

The general witnesses did not testify in this case. About 468 acres of accretion land along the Missouri River are involved. The assessor and board valued the land: 260 acres, described as tillable, at $20 an acre and 208 acres, described as waste, at $10 an acre. The trial court upon the sole testimony of a part owner, Mr. L. C. Stokely, Sr., reduced the assessment on the 260 acres of tillable land to $15 an acre. Mr. Stokely thought the wasteland worthless and the tillable land worth $10 an acre. There is no evidence at all of inequality of assessment. The only question is whether it was valued for assessment purpose in excess of actual valuation. The three board members testified it was not. Mr. Stokely said they get a crop in the years when the river does not overflow; that they took $5000 worth of wheat off of the land one year. We hold the taxpayer failed to sustain his burden of showing excessive valuation. The reduction to $15 an acre indicates the court did not share the opinion of the assessor and board that it was worth $20 an acre. But the court is not to act as assessor. The task of assessing property is originally placed upon the assessor and board who, presumably, possess

some special qualifications for the fulfillment of the functions of their offices. Judicial inquiry is restricted to whether they did perform the duties imposed upon them by law. Every determination of property value requires opinion and judgment. The court is not free to substitute his judgment and opinion until he finds, as said in Butler v. City of Des Moines, 219 Iowa 956, 961, 258 N.W. 755, 758, the action of the assessor is "arbitrary or capricious or so wholly out of line with the actual values as to give rise to the inference that for some reason he has not properly discharged his duty." The trial court's determination here that the assessment on tillable land was too high by $5.00 an acre hardly indicates a conclusion that he felt the assessor and board acted arbitrarily or capriciously. He had no assessment of other similar land before him to tell him whether this assessment was wholly out of line with assessments of other accretion land.

In this case there was an assessment for a hog house, valued at $480. Mr. Stokely testified there was no hog house on the farm. No one, testifying for the board, testified there was a hog house on the farm. All we have is the appraisal card (Exhibit 85) listing a hog house. When the taxpayer tendered the issue as to the existence of the building, it would seem the board should have secured testimony to corroborate the data on the appraisal card that there was a hog house on this farm if the assessment for a hog house is to be sustained. The trial court eliminated this assessment. We hold he was right. The cause is Reversed, in part, for decree confirming the assessment of the assessor and board as to the farm land and affirming the action of the trial court in eliminating the assessment on the hog house.

Appeal Case No. 6

McKENNEY, SEABURY FARMS, a corporation, v. BOARD

It is doubtful if this taxpayer ever appealed to the Board of Review. No written appeal was filed with the board and the taxpayer's attorney, Mr. Prichard, who testifies generally as to his oral presentation of appeals in nine of these cases, specifically excepted "McKenney-Seabury Land." Mr. McKenney said he wrote a letter to the board, but neither the letter nor its

contents are in evidence. He said he talked to one of the board members who told him "there wasn't anything could be done about it. The assessment had been spread on the books, and there wasn't anything that could be done." The only reason we consider the case at all is because one of the board members testified the board did consider the objection as to the McKenney-Seabury Farms.

The assessor valued 278.65 acres in Section 2 in Ashton Township at $70 an acre, and 40 acres in this Section and 146.27 acres in Section 3 at $60 an acre. The trial court reduced the assessment on the land valued at $70 an acre to a valuation of $65 an acre.

Mr. C. T. McKenney, described as a part owner of the McKenney-Seabury Farms, testified as to the profits and losses for the years from 1937 to 1948. He gave no opinion as to the value that should be placed on the farm land for assessment purposes. The other witnesses in this case were general witnesses, who all valued the land in both sections at $50 an acre. The board members testified the assessment was equitable and not in excess of actual value.

Much of our discussion in the previous case, Appeal No. 5, is applicable here. Without further discussion we hold the taxpayer failed to sustain the burden of proof. The cause is Reversed for decree confirming the assessment of the assessor and Board of Review.

## Appeal Case No. 7

### Geo. E. Olson v. Board

This farm consists of land described as "pretty good" located above the high bank of the Missouri River and lower land described as bar or accretion land. The assessor valued the upper land, about 31 acres, at $80 an acre, and the bar land, about 70 acres, at $20 an acre. The trial court reduced the valuation of the upper land to $65 an acre and the bar land to $15 an acre.

Mr. Olson's testimony was chiefly with respect to the bar land. He told of the frequent floods when he got nothing off of the land. It was hard to get him to place a value on this bar land. He supposed there were years when he could have gotten

as much as $40 an acre for this land and other years when "it wasn't worth anything"—depending, we assume, on whether or not they were flood years. He finally said he "wouldn't sell this bar land for $20 an acre."

The general witnesses stated they did not actually see this bar land but they were acquainted with this type of land and they talked with Mr. Olson, and, basing their opinion on their general knowledge of this type of land and what Mr. Olson told them, they placed a valuation on it of $10 an acre. We are of the opinion the taxpayer failed to sustain the burden of showing the valuation of the bar land placed thereon by the assessor and board was excessive.

The trial court reduced the valuation of the good land from $80 to $65, saying it was overassessed "as compared with the $90 assessment for the top lands of the county." As we have heretofore pointed out, this would not establish inequality.

Mr. Benson, one of the general witnesses, testified as to this land. In his tabulation he and Mr. John A. Johnson valued this land at $65 an acre, but in his oral testimony Mr. Benson said this 32 acres was "pretty good land—I would say it would sell for $100 to $110 an acre."

Actually the taxpayer's testimony goes quite far to sustain the valuations made by the assessor and board. At any rate it falls far short of sustaining the taxpayer's burden of showing the valuations were inequitable or in excess of actual value. The case is Reversed for decree confirming the assessments as made by the assessor and board.

## Appeal Case No. 8

### E. Grace Prichard et al. v. Board

The trial court reduced the valuation on taxpayer's farm, about 150 acres, from $70 an acre to $65 an acre. He also reduced the valuation of the barn on this farm from $1875 to $1250. The reduction was made upon the testimony of the general witnesses, who valued the land at $50 to $55 an acre and the barn at $800.

Our general discussion as to the testimony of the general witnesses and what we said in appeal case No. 5 is applicable

here. There is no testimony pointing out any errors on the appraisal card with respect to the barn.

. We are of the opinion the taxpayer failed to sustain the burden of proof of establishing the inequality or excessive valuation. The cause is Reversed for decree confirming the assessments of the assessor and board as to the farm lands and barn.

## Appeal Case No. 9

### FRANK A. HEISTERKAMP v. BOARD

The trial court reduced the valuation on about 111 acres of taxpayer's farm from $80 an acre to $70 an acre. The taxpayer, the only witness in this case, frankly stated his farm land was not valued in excess of its actual value. His testimony proceeds: "Q. And isn't it a fact or do you know that these other farms that adjoin you on all four sides are assessed on about the same basis? A. Yes. Q. And the valuations placed on those farms in your opinion are not less than the actual value, are they? A. That is right. Q. So that your complaint then is based entirely upon a comparison with these other farms that you have testified about? A. Yes. Q. So you feel that these other farms are assessed lower than their actual valuations? A. That is correct. Q. And therefore causing you to bear an unjust share of taxes? A. That is right. Q. And those particular farms are located several miles away from your farm, aren't they? A. Yes, approximately five to seven miles.",

No brief or argument was filed by the taxpayer in this court on the appeal that is here involved.

We are of the opinion the taxpayer failed to sustain the burden of proof to establish the valuations of the assessor and board were inequitable or excessive. The cause is Reversed for decree confirming the assessments of the assessor and Board of Review.

## Appeal Case No. 10

### GLENN L. CAVANAUGH and MARY E. CAVANAUGH v. BOARD

The trial court's decree in this case confirmed valuations placed on taxpayer's land and farm buildings. The appraisal

cards in this case on the taxpayer's Kennebec Township farm valued the tillable land (about 26 acres) at $50 an acre, the pasture land (about 13 acres) at $20 an acre, and the wasteland (about 5.4 acres) at $10 an acre. This is exactly the valuation placed on the tillable, pasture, and waste land by the taxpayer's witness Gray, who testified separately in this case. W. J. Benson and John A. Johnson who also testified separately in this case for the taxpayer would value the tillable and pasture land a little lower and the wasteland a little higher. The owner seems to value the pasture land and wasteland a little higher and the tillable land lower. The record presents nothing but a dispute between the taxpayer's witnesses as to value, one of whom would sustain the valuations as made. It does not sustain plaintiff's burden of showing the valuation placed on the farm land was in excess of actual value.

The taxpayer did not give an opinion as to the value of the buildings on this farm. His three witnesses would value them higher than the assessor and board.

The owner and his three witnesses valued his West Fork Township farm at $50 an acre. The assessor and board valued it at $70 an acre. The record shows the taxpayer paid $87.50 per acre for this farm in 1943. The trial court held the valuation of the assessor and board should be confirmed. The decree of the trial court in this case is Affirmed.

THOMPSON, C. J., and BLISS, GARFIELD, WENNERSTRUM, SMITH, MANTZ, and HAYS, JJ., concur.

OLIVER, J., takes no part.