J. ROSENBAUM & SONS, Inc., appellant, v. C. C. COULSON, chairman, et al., members of Appanoose County Board of Review, appellees.

No. 48645

(Reported in 69 N.W.2d 403)

April 5, 1955.

Valentine & Greenleaf, of Centerville, for appellant.

Charles L. Johnston, of Centerville, County Attorney of Appanoose County, for appellees.

BLISS, J.—Plaintiff's lots are legally described as Lots 1 and 4, Block 4, Range 4 in the Original Town of Centerville, Iowa, and are a half block north of the northeast corner of the Centerville square, on the west side of, and abutting on, North Thirteenth Street. Each lot is 100 feet square and together they have an area 200 feet north and south along the street, and 100 feet east and west. In 1953 the assessor appraised each lot at $5000, or $10,000 for the two lots and they were assessed at 60% of said valuation, as required by statute, or $6000. On plaintiff's protest to the Board of Review that body confirmed the valuation and assessment, which were later affirmed by the district court on plaintiff's appeal.

Plaintiff has no improvements on either lot and had leased them to near-by garage operators for the storage of used motor vehicles. From August 15, 1946 to December 31, 1946 the rental was $60 a month, and from the latter date to January 1, 1953, the monthly rental was $75, and, in addition, the lessee paid the real-estate taxes. From January 1, 1953 to September 30, 1954 the rental was $100 a month, and, in addition, the lessee was to pay all real-estate taxes on the property and any special assessments that became due during the term of the lease, and annual special assessments in the sum of $44.96.

For the assessment in 1949 the county assessor had devised a plan which had approval of the State Tax Commission by which all land on the Centerville square was assessed at $120 a front foot, or 60% of a front-foot appraisal of $200, and all land within one block off the square was assessed at $60 a front foot. This plan did not apply to residential property located within one block of the square. This same plan was used in the 1953 assessments.

In plaintiff's protest to the Board of Review, of May 12, 1953, it objected to the assessment against the real estate, as of January 1, 1953, in the sum of $6000, on the following grounds:

1. The assessment is not equitable as compared with assess-

ments of other like property. (Then follows the description of five properties within the blocks around the Square, with their respective assessments for 1953.)

2. That its property is assessed for more than the value authorized by law, and that the overassessment is $3600, and its actual value is $4000, and that 60% thereof or $2400 is a fair assessment.

3. That residential property in the Centerville taxing district, constituting approximately 41% of all the taxable property, is generally assessed at 25% of its actual value.

4. That personal property in said taxing district, constituting approximately 17% of all taxable property, is generally assessed at 25% of its value.

5. That utility property in said taxing district, constituting approximately 27% of all taxable property, is generally assessed at 42% of its actual value.

6. That protestant's property is assessed in excess of 100% of its actual value and is bearing greater than its proportionate share of the tax burden.

Protestant prayed that its assessment be reduced to an amount that "is fair, equitable, and just, or canceled if property is not assessable."

It was stipulated that the protest was denied May 22, 1953, the Board adjourned May 29, 1953, and notice of appeal was served on the Board on June 8, 1953, and on the same day plaintiff filed its petition of appeal in the district court, alleging the assessment, the protest thereto, and the grounds of the protest, designated paragraph 5 (a,b,c,d), with two additional grounds, to wit: that there is fraud in the assessment of its property in that it is business property and that business property is deliberately, designedly, and according to a definite plan assessed at a higher per cent of its actual value than are other types of property in the Centerville taxing district, all as more specifically set out in paragraph 5 (a,b,c,d) the grounds of the protest; and subparagraph (e) to paragraph 5 thereof, to wit: that the assessment of its property is inequitable as compared with the assessment of other similar property in said tax district.

Plaintiff prayed that the court reduce its assessment, and for further equitable relief.

Defendants' answer admitted their membership in the Board of Review, plaintiff's ownership of the land, the assessment thereon, the denial of the protest, and denied the assessment was not equitable as compared with other assessments of similar property in the Centerville taxing district, and with respect to residential, personal, and public utility property, and denied that the assessment of plaintiff's property as business property was fraudulent. The answer admitted that, in the Centerville taxing district, residential, personal, and utility property constituted respectively 37%, 17% and 27% of all taxable property.

Plaintiff used the Appanoose County Assessor as its witness. He testified to his instruction of the deputy assessors as to the front-footage assessment of $120 on property around the square, and $60 a front foot on property in the blocks directly off the square, according to the survey and card system made out the previous fall, and similar to the plan used in the 1949 assessment. They were instructed that they could use their own judgment and depart from the plan if they thought a change was justified. The designated front footage was to be their standard. These cards were made for practically every property in town. Residential properties located within a block of the square were not assessed on a front-footage basis, and, if it was used, the residential front footage was generally lower than the business front-footage basis. The assessments as made were generally as designated on the cards.

Plaintiff used as valuation witnesses Ralph Packard, Henry Dukes and Hale Greenleaf, real-estate brokers or agents in Centerville, who testified to their respective qualifications and knowledge generally of real-estate values in Centerville. Each testified that one of the plaintiff's attorneys in his automobile took the witness along different streets in Centerville and either asked the witness his opinion of the market values of designated business and residential properties as of January 1, 1953, or the witness voluntarily expressed his opinion of such values of other properties with which the witness was familiar. A list of these properties of which each witness had expressed a value opinion was prepared by the witness or the attorney or someone, and marked as an exhibit and received in evidence. Each such ex-

hibit had four columns. In the first or left-hand column were the legal descriptions of the properties. In the second column were the "Assessed Values" (presumably taken from the official or public tax records, although the evidence does not definitely so show). In the third column, designated "Appraised Values", were the values of the properties in the opinion of the witness. In the fourth column, designated "Per Cent", are shown various percentages. None of these three witnesses testified with respect to his "Per Cent" column, or as to just what the percentages were, but we ascertain from a few computations, and from statements in appellant's brief and argument, that the percentage figure noted as to each property indicates what percentage the "Assessed Value" is of the witness' opinion value as shown in the "Appraised Value" column. The record does not show the actual value which the assessor placed on any of these properties. The lists of the three witnesses, being Exhibits P-2 to P-7 inclusive, include 124 pieces of property, mostly improved business and residential properties. The first twelve properties, except item 4 on Exhibit P-2, and the eight properties on Exhibit P-3, being the lists of the witness, Mr. Packard, are apparently improved business properties, the other thirty-two items in Exhibit P-2 are residences. The forty or more business and residence properties in Exhibits P-4 and P-5 were those on which Mr. Dukes placed values. Mr. Greenleaf apparently listed the thirty-two properties shown in Exhibits P-6 and P-7. These witnesses testified to very few facts relative to the locations of these properties, the character of the improvements, type of construction, their size, age, state of repair, their earning capacity, or rentals. Section 441.13 of the 1950 Code refers to various matters which the assessor shall take into consideration in determining the actual values of taxable property. The record gives no information of these or other matters affecting the values of the properties in those exhibits. Each of these witnesses included plaintiff's two lots in his list. Mr. Packard noted their assessed value at $6000, his opinion of their value at $5000, and the "Per Cent" as 120%. He had no knowledge of their rental income, and gave the matter no consideration. He testified that had he known of it, he would have placed the market value of the lots at $10,000. Mr. Dukes' list showed the assessed value of the lots as $6000, his opinion of

their value as $5000, and the percentage as 120%. He testified that he had no knowledge of the rents received from the lots when he formed his opinion of their value, but nevertheless he would not change his opinion. Mr. Greenleaf appraised plaintiff's lots at $6000. Having the thought that these rentals might not continue, the witness said he would not increase his valuation, but, assuming those rentals would continue for five years, he thought the valuation as of January 1, 1953 "would be up around $10,000."

Section 441.13, Code of 1950, after stating that all taxable property shall be valued at its actual value and "assessed at sixty percent" thereof, provides: "In arriving at said actual value the assessor shall take into consideration its productive and earning capacity, if any, past, present, and prospective, its market value, if any, and all other matters that affect the actual value of the property; and the burden of proof shall be upon any complainant attacking such valuation as excessive, inadequate, or inequitable."

Mr. Packard testified: "In making the appraisals, I made no attempt to separate the land and the buildings or appraise them separately. My appraisals represent the land and the buildings. In these appraisals I did not take into consideration income, either the past or the present or the future; but they represented my appraisals solely upon what the market value is, what a willing buyer would pay and a willing seller would take." Mr. Dukes and Mr. Greenleaf gave like testimony. These witnesses depreciated the value of plaintiff's lots because they fronted on a street narrower than some other streets and they are across the street from the Iowa Southern Utilities Company's powerhouse, and subject to the noise and steam therefrom. They testified that the front-footage values of properties fronting on and adjacent to the square varied because of location and other conditions.

Defendants objected to the testimony of the witnesses Packard, Dukes and Greenleaf respecting their appraisals of the various properties listed in Exhibits P-2 et al., and to the exhibits, as the valuations of improved business and residential properties were not in the same classification as vacant business lots or comparable with or similar to plaintiff's lots, and the testimony was therefore irrelevant and immaterial.

Mr. Brooks, apparently the city assessor, testifying for plaintiff, said that he assessed most of the property around the square in 1953, and within a block of it, including plaintiff's lots. He testified: "Going around the square I assessed the land separately from the buildings. I received certain instructions as to how to assess the land. * * * I assessed every running foot around the square at $120. That's the assessed value, or sixty per cent value; and off the square and up to Maple Street, Haynes Avenue, Washington, and Tenth, my base there was $60 on commercial, but not on residential, properties. I received these instructions from the assessor's office and followed them. My understanding of the whole thing was it was a set-up by a committee here in town and the State approved it. * * * We had a card system that was made out with valuations on them, and we followed that valuation. * * * I did make variations. * * * Around the square they were all just about the same, on front footage. * * * I just followed the instructions I was given to follow. I just followed the plan. I didn't exercise my own judgment."

Mr. Rose, the county assessor, who had testified for plaintiff was the only witness for defendants. He testified to the values of certain lots—the land value only—that were comparable, with respect to location and otherwise, to plaintiff's two lots. The first lot he referred to was the Oscar Gavronsky lot—Lot 6, Block 4, Range 2. It is 100' x 100' and is located a half block north of the northwest corner of the square on the west side of North Twelfth Street. With reference to the square it is in the same relative location as plaintiff's lots, which are located a half block north of the northeast corner of the square. The Gavronsky lots are just two blocks straight west of plaintiff's lots. The Gavronsky lot is assessed at $3000, just the same as each lot of plaintiff. Adjoining this Gavronsky lot on the north, and also owned by him, is a lot 100' x 50'—just half the area of the other Gavronsky lot. It is assessed at $1500.

The witness testified to another lot—Lot 7, Block 2, Range 2. It is owned by Frank Miller, and is 100' x 100', and is on West State Street, one half block west of the square. The assessed value of the land alone is $3000. Frank Miller owns another lot adjoining the one just referred to on the south. It is also 100' x 100', and is just a block west of the southwest corner of the square. It

was also assessed at $3000 in the January 1953 assessments. Only the land was so assessed.

Another lot the witness testified about is the Percy Norris lot, described as the North 75 feet of Lot 2, Block 4, Range 4, in the Original Town of Centerville. It is a block north of the square, on the corner of North Main and Washington Streets, and is immediately west of and abuts on plaintiff's north lot. It is 75 feet north and south by 100 feet east and west. Its area, therefore, is three fourths that of each of plaintiff's lots. Its assessment might fairly be three fourths the assessment of either of plaintiff's lots—three fourths of $3000 or $2250—but it is assessed at $2700.

The witness also testified to a lot owned by Jack Morris, described as Lot 3, Block 1, Range 2, in the Original Town of Centerville. Its size is 100'x100'. It is located at the corner of Jackson and Tenth Streets, just a block west of the southwest corner of the square. The assessed value of the land alone is $3000. There is no building on it. It is being used for the same purpose as are plaintiff's lots—for the storage of used automobiles. All of the lots testified to by Mr. Rose are closely comparable in location and in other general respects to plaintiff's lots. Plaintiff urges that his lots front on a narrower street, North Thirteenth, than do the others, and that the vicinity around the northeast corner of the square is less desirable for business purposes than some of the other corners.

We find no reasonable basis, under the record, for plaintiff's allegation and argument that "the assessment of appellant's property is inequitable as compared with the assessment of other similar property in said tax district", or that it "is assessed in excess of 100% of its actual value."

In fact, the plaintiff, while it alleged the grounds, quoted above in its petition in the district court, and has not wholly abandoned them in this court, discloses the real basis of its protest to the Board of Review, and of its appeal to the district court, and its position in this court, by the following language in its printed argument, to wit: "Appellant believes the record shows that its lots were assessed at more than 60% of their actual value and that such an assessment was inequitable even as concerns the few parcels of real estate which the court classified

as similar property. Those properties classified as similar were a few vacant business lots within one block of the square, which were assessed on the same front-footage basis as appellant's lots, even though the record shows they were all better located. However, an adjustment reducing appellant's assessment to less than 60% of the actual value of the lots and making said assessment equitable with those lots classified as similar would only be a minor adjustment and would not warrant the prosecution of this appeal. Therefore, in order to present squarely to this court what we believe to be the real question, it is not our intention to argue the foregoing matter, but to present by this appeal only the following question. Is appellant entitled to a reduction of its assessment if it shows (1) that all business lots on or within one block of the square in Centerville, Iowa, are assessed arbitrarily and under a definite plan or scheme without regard to favorable or unfavorable locations; and if (2) it shows the application of this plan results in appellant's lots being assessed at 60% of their actual value and business properties in said·taxing district being generally assessed at 50% of their actual value; and if (3) it shows that all other property in the taxing district to which said plan does not apply is generally assessed as follows: residential property, 24% of its actual value; utility property, 36% of its actual value; and personal property, 30% of its actual value."

The claimed percentages set out in subdivision (3), just above, have little, if any, definite support in the record. Whatever support there is, is in the testimony of County Assessor Lloyd Rose, as a witness for plaintiff. He testified: "The State Tax Commission came out with a paper last summer that showed the assessments on real estate and personal property both percentagewise, and they figured over the state your real estate was assessed around 31% of its value, and your personal property was right around 30%. I have not received an estimate from them as to how our assessments down here on personal property stacked up. I don't know whether or not the personal property is assessed at any more than 30% of its actual value. * * * I can guess, but my guess is sometimes away off. On the basis of what I know, as a result of my office and my experience, I would

guess the average assessment of personal property is 50 or 60%. * * * For clarification, if a man had an inventory worth $100, if it were assessed as the law says, it would be assessed at $60; but my best guess is that in Centerville it is assessed at half of that, or $30."

■ I. But regardless of this testimony, in appeals by a taxpayer who alleges that the tax against his property is inequitable or out of proportion to the tax on other property, the other property must be of a character, class, or kind similar to his property. In this appeal the property which plaintiff alleges is inequitably and disproportionately assessed consists of two vacant business lots, and in determining that inequity his assessment must be compared to the assessments on property of a similar kind. Testimony as to assessments of improved business and residential property, personal property, or the property of public utilities is irrelevant and immaterial.

In denying the plaintiff relief and in affirming the holding of the Board of Review, the district court, in its conclusions of law, said: "Plaintiff's principal complaint is that in Centerville business properties are valued at approximately fifty per cent of market value and personal property and residential properties at approximately twenty-five per cent. * * * However, the court does not find it necessary to determine that question, and it would have no bearing on the result of this case if the court did undertake to determine it. The law seems fairly well established that the matter of equalization between different classes of property is not the purpose of a tax appeal such as this. That is a responsibility which the legislature has placed upon the taxing authorities and cannot be done by the courts in a tax appeal, though the courts in a proper case may compel the taxing authorities to follow the law in that respect."

■■ This court uniformly has held that a taxpayer, in an appeal of this kind who complains of inequality or discrimination in the valuation and assessment of his land as compared to other land in the taxing district, must establish that the other land is of the same class, character and kind as his. The matter was fully discussed in Daniels v. Board of Review of Monona County, 243 Iowa 405, 411–414, 419, 52 N.W.2d 1, in which case the comparison was between wet bottom land and high ground

without drainage problems. Speaking for the court, Justice Mulroney said at page 411: "The trial court correctly stated the issues in each appeal were whether the assessments were based on a valuation above actual value or inequitable *in comparison with like properties.* [Italics ours.] * * * [page 413] We do not mean to hold that inequality of assessment must be established by evidence of assessment of exactly similar property. But there must be some substantial similarity before a basis for comparison is presented. * * * They admit the comparison here is between bottom farm land that is wet, subject to overflow, and heavy, comprising ninety-five per cent of the farm land in the county and high land, with the finest soil and without drainage problems, comprising five per cent of the farm land in the county. * * * [page 419] On the claim of inequality of assessment the taxpayer's burden is not met by testimony that his property is assessed at a higher proportion to its actual value than *some* other property. The claim of inequality requires proof of assessments of similar property. And again this testimony must rise higher than a mere difference of opinion between the witnesses as to values. In short it must be such as to show the assessor and board did not do their duty. * * * Butler v. City of Des Moines, 219 Iowa 956, at page 961, 258 N.W. 755, at page 758." See also Clark v. Lucas County Board of Review, 242 Iowa 80, 90, 44 N.W.2d 748, 754 ("Before a property assessment can be changed because it is inequitable as compared to the valuations of similar and comparable properties in the same district it must first be shown that there are such similar properties. If there are none then, of course, no comparison can be made.") ; Lincoln Joint Stock Land Bk. v. Board of Review, 227 Iowa 1136, 1140, 290 N.W. 94, 96 ; Crary v. Board of Review, 226 Iowa 1197, 1200, 286 N.W. 428 ; Hanson v. Local Board of Review, 232 Iowa 390, 392–394, 396, 4 N.W.2d 384 ; Deur v. Local Board of Review, 232 Iowa 989, 991, 7 N.W.2d 39 ; In re Appeal of Bankers Life Co. v. Zirbel, 239 Iowa 275, 284, 285, 31 N.W.2d 368 ; Benson v. Town of Le Claire, 185 Iowa 506, 507, 170 N.W. 747 ; Butler v. City of Des Moines, supra, 219 Iowa 956, 957 ; Corn Belt Theatre Corp. v. Board of Review, 234 Iowa 355, 360, 361, 12 N.W.2d 820 ; Iowa Building

Corp. v. Zirbel, 237 Iowa 242, 247, 21 N.W.2d 576; Chapman Brothers v. Board of Review, 209 Iowa 304, 308, 228 N.W. 28; Talbott v. City of Des Moines, 218 Iowa 1397, 1403, 1404, 257 N.W. 393; Trustees of the Estate of Flynn v. Board of Review, 226 Iowa 1353, 1356, 286 N.W. 483.

II.   As stated in section 441.13 of the Code of 1950 and 1954, the burden of proof is upon the complaining taxpayer to show that the valuation to which he objects is excessive or inequitable.   This court has so held many times.   Sioux City Bridge Co. v. Board of Review, 192 Iowa 1224, 1225, 1226, 184 N.W. 733; In re Appeal of Bankers Life Co. v. Zirbel, supra, 239 Iowa 275, 279; Daniels v. Board of Review, supra, 243 Iowa 405, 409; In re Appeal of Massachusetts Mutual Life Ins. Co., 233 Iowa 916, 927, 11 N.W.2d 17; Des Moines Building-Loan & Savings Assn. v. Bomer, 240 Iowa 1192, 1198, 1199, 36 N.W.2d 366.

III.   The 1953 tax assessments in Appanoose County were made by the local taxing authorities without the aid of any outside professional appraisers.   We have uniformly and frequently held that there is a strong presumption in favor of the valuations of the assessor and the confirmations thereof by the board of review.   Hanson v. Local Board of Review, supra, 232 Iowa 390, 393; Trustees of the Estate of Flynn v. Board of Review, supra, 226 Iowa 1353, 1357; Butler v. City of Des Moines, supra, 219 Iowa 956, 961; Clark v. Lucas County Board of Review, supra, 242 Iowa 80, 97, 98, ("The board of review having confirmed the assessment, the presumption is that the value so fixed by the board is correct, just, and equitable, and, until the contrary appears, that it performed its duties as required by law."); Call v. Board of Review, 227 Iowa 1116, 1119, 1120, 290 N.W. 109, 110; In re Appeal of Dubuque-Wisconsin Bridge Co., 237 Iowa 1314, 1315, 1316, 25 N.W.2d 327; Daniels v. Board of Review, supra, 243 Iowa 405, 409, 410.

We find no merit in any of the propositions relied upon for reversal by plaintiff.   It has failed to overcome the strong presumption that the valuation of its property as fixed by the assessor and the board of review is just and equitable.   We find that the valuation of the taxing authorities is not arbitrary nor capri-

cious, but is the result of their sound and honest judgment. The decree of the able district court is therefore affirmed.—Affirmed.

All JUSTICES concur.